Leo Fox, Esq.
630 Third Avenue - 18th Floor
New York, New York 10017
(212) 867-9595
leo@leofoxlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:                                                          Chapter 7

A.N. FRIEDA,                                                     Case No. 15-11862 (MEW)

                                      Debtor.
-------------------------------------------------------------X
MATTHEW C. HARRISON, JR.,

                           Trustee-Plaintiff,

-      against      -                                            Adv. Pro. No. 17-01103 (MEW)

RONEN KONFINO, FRIEDA KONFINO
RONI RUBINOV, NEW LIBERTY PAWN
SHOP, INC., NEW YORK ESTATE BUYERS
and ABNER RUBINOV a/k/a AVNER
RUBINOV,

                           Defendants,

-      and      -

VNB NEW YORK, LLC,

                           Defendant-Intervenor.
-------------------------------------------------------------X

## NOTICE OF MOTION FOR SUMMARY JUDGMENT
## AGAINST NEW LIBERTY PAWN SHOP AND RONI RUBINOV

*PLEASE TAKE NOTICE* that upon the Local Rule Statement of Material Undisputed

Fact and the Memorandum of Law of Matthew C. Harrison, Jr., the Plaintiff-Trustee for the

Estate of A.N. Frieda, by his attorney, Leo Fox, Esq., and VNB New York LLC will move

before the Honorable Michael E. Wiles, United States Bankruptcy Judge, in his Courtroom,

United States Bankruptcy Court, Southern District of New York, located at one Bowling Green, New York, New York on June 18, 2019 at 10:00 a.m. or such other date Ordered by the Court or as soon as thereafter as counsel can be heard, for an Order granting Summary Judgment against New Liberty Pawn and Roni Rubinov with respect to the First Third and Sixth Causes of Action and for the First, Second, Third Cross-Claims against Defendants, New Liberty Pawn and Roni Rubinov, alleged in the Cross-Claims of VNB New York LLC all for conversion, and for such other and further relief this Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE** that opposition of the Motion, if any, must be (1) made in writing; (2) electronically filed with the court; (3) mailed to Chambers of the Honorable Michael E. Wiles, United States Bankruptcy Judge, One Bowling Green, New York, New York 10014-1408; (4) mailed to Leo Fox, Esq., 630 Third Avenue, 18th Floor, New York, New York 10022 and (5) mailed to the Office of the United States Trustee. U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10004 so as to be actually received no later than seven (7) business days before the return date of the Motion at 4:00 p.m.

**PLEASE TAKE FURTHER NOTICE** that the hearing may be adjourned without further notice other than by announcement of such adjournment in open Court.

Dated: New York, New York
May 14, 2019

Respectfully submitted,

/s/ Leo Fox
Leo Fox, Esq.
Attorney for Matthew C. Harrison, Jr.
Plaintiff-Chapter 7 Trustee
630 Third Avenue - 18th Floor
New York, New York 10017
leo@leofoxlaw.com

/s/ Peter Janovsky
Peter Janovsky, Esq.
Bryan Leinbach, Esq.
Attorneys for Plaintiff
The VNB's Bank of New York,
a Division of Valley National Bank
575 Lexington Avenue
New York, New York 10022
pjanovsky@zeklaw.com

2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:                                                        Chapter 7

A.N. FRIEDA,                                                  Case No. 15-11862 (MEW)

                                    Debtor.
-------------------------------------------------------------X
MATTHEW C. HARRISON, JR.,

                          Trustee-Plaintiff,

          -    against    -                                   Adv. Pro. No. 17-01103 (MEW)

RONEN KONFINO, FRIEDA KONFINO
RONI RUBINOV, NEW LIBERTY PAWN
SHOP, INC., NEW YORK ESTATE BUYERS
and ABNER RUBINOV a/k/a AVNER
RUBINOV,

                          Defendants,

          -    and        -

VNB NEW YORK, LLC,

                          Defendant-Intervenor.
-------------------------------------------------------------X

## STATEMENT OF MATERIAL UNDSIPUTED FACT
## PURSUANT TO LOCAL RULE 7056

Trustee-Plaintiff and VNB New York LLC hereby submits this Statement of Material

Undisputed Fact pursuant to Local Rule 7056.

### BACKGROUND

1.    This case was filed by the Petitioning Creditors on July 16, 2015. On September 9,

2015, an order for relief under Chapter 7 was entered.  The schedules were filed thereafter (*Exhibit*

*4*).

2.      On or about August 5, 2015 (*Exhibit B*), this Court entered an Order directing that all persons holding property of the estate turn over such property to the Interim Trustee (Docket No. 20).

3.      On or about August 14, 2015 (*Exhibit C*), this Court entered an Order providing that the Debtor submit a list of assets held by others and directed that all such persons turn over such property, the persons who were the subject of the August 14, 2015 Order, identified by the Debtor's principal as a person holding such assets who was named explicitly in the August 14, 2015 Order (Docket No. 24), which also provided that any liens with respect to the property turned over would continue to remain in effect to the same extent and priority.

4.      On August 18, 2015, in an exchange of emails, (*Exhibit D*), the Interim Trustee's attorney, David Dinoso, requested, in writing, of Daniel J. Gotlin, the attorney for RR and New Liberty Pawn Shop to permit the Interim Trustee to appear and take an inventory of the merchandise in New Liberty Pawn Shop's vault in compliance with the Order. On the same day, Mr. Gotlin responded that New Liberty Pawn Shop was going through the records to determine the extent of the inventory and instructed the Interim Trustee not to appear to take an inventory. RR claims he did not learn of the Bankruptcy until December 2015 (Transcript 5/24/16 Pages 8-9 collectively *Exhibit X*, *Exhibit Y* and *Exhibit Z*)).

5.      On or about September 16, 2015 (*Exhibit E*), the Court entered an Order that within one (1) business day RR and New Liberty Pawn Shop were to turn over any property of the Debtor in their possession and provide an accounting to the Interim Trustee (Docket No. No. 54). The Interim Trustee filed an Affidavit of Service reflecting that the Order was served upon RR and upon New Liberty Pawn Shop (Docket No. 55).

6.      On or about December 2, 2015 (*Exhibit F*), the elected Trustee, Matthew C. Harrison, Jr., wrote a letter to RR and New Liberty Pawn Shop regarding the Court Orders.

7.      By Order dated March 16, 2016 (*Exhibit G*), RR and New Liberty Pawn Shop were directed to identify all property of the Debtor's estate and documents by March 31, 2016 and provide the Trustee by March 28, 2016 a list of all available dates for deposition (Docket No. 101).

8.      RR testified that Defendant, New Liberty Pawn Shop, was owned by RR (Tr. Page 42) and was a pawn broker that made secured loans secured by the delivery of merchandise as collateral to the pawn broker at the rate of interest of either 3% or 4% per month (Tr. Pages 45, 46). Ronen Konfino ("Ronen"), the Debtor's principal, had been a client since 2013 (Tr. Page 33).

9.      Avner, RR's father, testified he pushed RR to open up a pawn shop business. Avner would appraise merchandise for loan collateral purposes (Avner 1/28/19 Tr. Page 184).

10.     RR testified that if a loan defaulted consisting of a failure to pay interest over four (4) months, RR would sell the merchandise collateral to an entity called New York Estate Buyers, an entity located at 67 West 47th Street, New York, New York. New York Estate Buyers is owned by Avner (Tr. Pages 42, 126).

11.     RR and New Liberty undertook a total of 135 separate pawn loan transactions during the time period beginning December 2013 through March 2015 (*Exhibit H*).

12.     Over the time period in question, New Liberty loaned the total sum of $3,460,690 and issued these loans primarily in cash transfers (*Exhibit I* and RR EBT Transcript 5/24/2016 Pages 68-69).

13.     In May 2015, there remained 44 pawn loans (corresponding to a principal loan sum of $1,005,033.00) - which had either already fallen into default status or over the next two months - subsequently became defaults (*Exhibit J* and *Exhibit K*). Many of these loans were in a default

3

status going back to the Fall of 2014 - but New Liberty did not initiate the foreclosure process until July 9-10, 2015 (see Default Notices, Joint Pretrial Order Defendant Exhibit C). The borrower did not cure any defaults alleged by New Liberty. New Liberty determined to sell the collateral and did so in five separate transactions beginning on August 10, 2015 (collectively *Exhibit L*). New Liberty sold said collateral to Defendant New York Estate Buyers ("NY Estate") - a company owned and operated by RR's father, Defendant Abner Rubinov (Tr. Pages 64 and 81) (Avner denies that this merchandise was ever sold to New York Estate Buyers).

14.    RR testified that the sales to New York Estate Buyers (Avner claims was allegedly sold) were documented by five (5) purchase order with a reference on the left-hand side to the loan that related to the collateral (Tr. Pages 128 and 129) that was (Avner claims was allegedly sold) sold to New York Estate Buyers.

15.    RR testified that the merchandise, which was collateral for the defaulted loans was sold (Avner claims was allegedly sold) to New York Estate Buyers and was reflected on the five (5) purchase orders dated August 10, 2015, August 15, 2015, August 26, 2015, September 15, 2015 and September 29, 2015 (see *Exhibit L*) (Tr. Page 115, 123) (4/20/18 Tr. Pages 36-38).

16.    RR testified that these five (5) shipments of merchandise, which was collateral for the defaulted loans were sold (Avner claims allegedly sold) in the following manner, price and on the following dates.

Gap Period
(July 16, 2017 – September 9, 2015)

| | |
|---|---|
| August 10, 2015 | $255,156 |
| August 15, 2015 | $154,455 |
| August 25, 2015 | $292,103 |
| September 5, 2015 | $152,262 |
| Total | $853,976 |

4

Chapter 7 Period

September 29, 2015                    $186,057

Total                             $1,037,033

17.      Avner, at his deposition, denied (a) purchasing the merchandise on his own behalf or on behalf of New York Estate Buyers or any person (Avner Tr. Pages 101, 142-143, 149-150), (b) issuing the purchase orders (Id. Pages 73-74, 92), (c) writing the purchase Orders and (d) that the handwriting on the purchase orders was RR's (Id. Page 122). Avner states that in 2014 Ronen Konfino came in to borrow money from RR, and Avner appraised the collateral offered by Ronen and determined that the stones were not real (Id. Pages 133-135).

18.      RR, by his attorneys in this litigation, delivered a digest of all transactions reflecting a three page digest commencing December 2013 up through March 26, 2015 representing collateral loan transactions which were redeemed by the pledgor and the last page (one page) reflecting loans made pre-petition and which were post-petition foreclosed after the bankruptcy filing by New Liberty Pawn Shop (Avner claims allegedly sold) to New York Estate Buyers under the five Purchase Orders (*Exhibit M* and *Exhibit N*).

19.      RR's attorneys report reflects that the collateral sold pursuant to the five (5) purchase orders was at a price based on a small percentage over the unpaid loan balance and not the value of the collateral (RR Deposition 4/20/18 Tr. Pages 79-81). Since RR knew the market, he does not need to test it and he didn't trust anyone outside to liquidate the collateral (Tr. Page 132). He always sold the unredeemed collateral to New York Estate Buyers. (Tr. Pages 48 and 51, 123 and 124). RR stated that there was no conflict of interest in this transaction because the father and son did not have a good relationship (Tr. Page 134). They both sat down and went over the merchandise and agreed upon a price (Tr. Page 132). RR testified that he did not need to test

5

the market to sell the merchandise and he only had to see the loan to determine the collateral value and he only needed to see the merchandise and the Rapport Diamond Value Listing Sheet (Tr. Page 135). He stated that New York Estate Buyers is not his company (Tr. Page 138). But RR and his father are partners in New York Gold & Silver Refiners, precious metal scrap business (Tr. Page 136). If a pawn is less than $2,000 value, it is melted down by New York Gold & Silver Refiners (Tr. Page 136). Sometimes they put an ad in the papers (Tr. Page 137) and it is his call whether to advertise (Tr. Page 138).

20.     In or about December 2014, RR began hearing rumors that Konfino owed money and tried to reach him five (5) to ten (10) times (Tr. Pages 138-141). According to RR, the rumors he began hearing in December had nothing to do in selling the collateral in August 2015 (Tr. Page 142) and the sales to New York Estate Buyers had nothing to do with the bankruptcy (Tr. Page 145). (RR Tr. Page 82).

21.     The Debtor sold watches to its customers in addition to diamonds and jewelry (*Exhibit O*).

22.     The schedule from RR's attorneys representing defaulted loans was analyzed by the Trustee's accountants who reconciled that total purported selling price for the collateral with respect to the five (5) purchase orders was $1,037,033, which collateralized a purported loan balance of $1,005,033 (*Exhibit P*). This merchandise, based upon RR's testimony that he advanced loans up to 80% of the value of the merchandise, (RR Tr. 54, 55, 63, 66 and 69) meant that at the loan origination based on the loan balance of the unredeemed loans in the amount of $1,005,033, there should have been collateral with a value of at least $1,256,291.25.

6

23.      However, paragraph 5 of the Additional Terms and Conditions of Loan (*Exhibit Q*)
provides "for the purpose of determining any claims against us [the pawn broker], this pledge shall
be deemed to have a value of not exceeding twice the amount of our loan stated on this ticket"
[brackets suppled].   Based on this valuation method, the merchandise collateral on loans of
$1,005,033 would have a value or $2,010,066.

24.      Avner testified that generally the loan would be 50% of the collateral value (Avner
Tr. Page 188).

25.      RR claimed that the sales terms of the Purchase Order was "to get paid as soon as
possible" (RR 5/24/16 Tr. Page 122).   The purchase order is the only document reflecting the
transactions from New Liberty Pawn Shop to New York Estate and there were no invoices or
memorandum reflecting the sales (RR 5/24/16 Tr. Page 122).

26.      RR testified that Avner paid only $240,000 of the purchase price and agreed to pay
the balance within the year.   No written proof of payments was ever provided.   It appears that this
amount corresponds to the amount that Avner testified was the loan made by Avner to the initial
funding of New Liberty Pawn Shop.

27.      In or about 2006, pursuant to loan agreements and UCC filings, the Debtor
borrowed money and entered into a security agreement purportedly granting Valley National Bank
a security interest in certain assets of the Debtor, including, but not limited to, the Debtor's
inventory (*Exhibit R*).   That security agreement provided, in relevant part, that the sales or transfers
of inventory which were made in the ordinary course of business would be free and clear of the
liens of Valley National Bank but that sales not in the ordinary course of business would not be
free of such security interest.

7

28.     Post-petition, Defendants, RR and New Liberty Pawn Shop his wholly-owned and solely controlled entity holding the Debtor's merchandise having a value of between $1,200,000 to $2,000,000 (the "Section 549 merchandise") have maintained that the Section 549 Merchandise was transferred over five (5) separate purchase orders during the period August 5, 2015 through September 29, 2015 (all occurring post-petition) during the "gap period" and "Chapter 7 period" without a Court Order of Authorization.  As of this date, Defendants have failed to return a single item of Section 549 merchandise despite demand therefor.

29.     RR asserts that the Section 549 property belonged to Ronen Konfino instead of the Debtor and, therefore, there was no "transfer" of the assets of the Bankruptcy Estate claiming, among other things, that watches were transferred and watches was not the business of the Debtor. The Trustee submits evidence demonstrating that nearly all of the pawn tickets had both names of the Debtor and Ronen Konfino, Ronen Konfino never reported any merchandise inventory or income from the sale of merchandise or interest deductions for the loans on his 2013 tax returns (*Exhibit S*).  The Debtor sold watches to its customers (*Exhibit T*).  The Debtor is reflected on its bank statements (*Exhibit T-1*) of having paid in excess of $379,000 to RR Rubinov Inc. during the period July 2014 through January 2015 reflecting either sales of merchandise by RR Rubinov Inc. or the redemption amounts for the pawned merchandise which is inconsistent with the position that § 549 merchandise was not the Debtor's property but never produced the underlying invoices or memoranda to support the statement that were for merchandise.

30.     The Defendants produced 44 pawn tickets for the unredeemed merchandise.  Nearly all the pawn tickets reflect the names of both Ronen Konfino and AN Frieda as the "owners" of the merchandise.  Of the 44 pawn tickets delivered to the Trustee, all but two (2) name Ronen

8

Konfino and AN Frieda Diamond on the ticket. Thus, ticket number #2482 for $35,000 and #2855 for $20,000 have Ronen's name alone (see *Exhibit Q*).

31.    The Trustee's Accountants calculated a total of 67 checks from the Debtor payable to RR Rubinov Inc., Defendants' company, totaling $379,410.55 from August 1, 2014 to June 2, 2015 establishing that that the Debtor, and not Ronen Konfino personally, paid for and redeemed the pawned merchandise. (*Exhibit U*) RR testified that some of these payments may have been made for merchandise shipped to the Debtor and that he had records which could confirm that statement (4/20/18 Tr. Pages 58-59) (RR never produced such documents). The Debtor's Accounts Payable for August 31, 2014, October 31, 2014 and December 31, 2014 do not list RR Rubinov Inc. as an account debtor (*Exhibit U-1*). RR knew that the Debtor was paying the redemption for the loans. (RR Deposition 4/20/18 Pages 50-51).

32.    In early 2014, RR was aware that Ronen Konfino was the principal of the Debtor's entity (RR Tr. Dep. 4/20/18 – Page 62).

33.    A total of $3,460,690 in loans were made by New Liberty during the period December 2013 to July 2015 (*Exhibit V*). There would have to be inventory having a value of approximately $4,325,862 to support such loans at an 80% valuation.

34.    The Debtor's 2014 Tax Return for the year ending December 31, 2014 reflects inventory of $4,548,350 which was not sold prior to the Involuntary Petition and was not on hand on the Filing Date in July 2015 (there are also claims of over $2,000,000 by trade creditors scheduled by the Debtor (see *Exhibit A*). However, only merchandise having a value of less than $100,000 was located post-petition and returned from third parties. Shortly after the Petition Date, the Interim Trustee, Ian Gazes, examined the Debtor's property at its Premises and in any vaults maintained by the Debtor, and located no inventory. The Debtor's principal informed the Trustee

9

that diamond inventory was located at Friend & Co. in New Orleans and with Roni Rubinov, and, provided schedules for each. Rubinov claimed he did not have any of the diamonds on the list.

35.    In or about January 2016, Friend returned certain diamonds, which were placed in a safety deposit box opened in the name of the Trustee at a Valley branch (the "Box"). On or about January 28, 2016, Valley Officer John Stine along with the elected Trustee, Matthew Harrison, and a diamond appraiser, examined this inventory at Valley. According to the appraiser, the value of the Friend Inventory was less than $50,000. In or about March 2018, Friend sent additional diamonds to the Trustee, which were also placed in the Box. These were estimated to be valued at approximately $25,000 or less.

36.    Ronen Konfino, however, reflected having personal jewelry of no more than $350,000 on his 2014 Financial Statement (*Exhibit W*). The disposition of this inventory can only be explained by the Debtor's unauthorized transfer of inventory to Ronen Konfino, who surreptitiously transferred the inventory to the pawn broker who "laundered" the inventory for Ronen Konfino.

37.    There is no dispute by RR that the two (2), Avner and Roni, worked closely together for years, that all foreclosure inventory which came into the hands of New Liberty, was sold to Avner, at a price, which these participants set, based on the relationship to the loan balance and not to the actual value of the inventory.

38.    The RR testimony establishes that RR and New Liberty Pawn knowingly engaged in a program with the Debtor over two (2) years, whereby, in consideration for loan "interest" of between 3% to 4% monthly proceeded in 144 transactions to effect and assist Ronen Konfino and

Frieda Konfino in accepting for diversion purposes merchandise having a value of $4,325,862 and thereby enabling and effecting a collapse of the Debtor and the removal of all of its assets at a time that the Debtor was insolvent at the loss to the creditors.

39.    The Trustee's Complaint sought to recover damages for the merchandise which Rubinov was holding in the amount of $1,256,291 or such other amount as determined by the Court in the First Cause of Action under § 549 and for conversion of such merchandise against Roni Rubinov and New Liberty in a Third Cause of Action and for diversion of the Debtor's inventory in the amount of $4,500,000 representing the funds which were diverted in the Sixth Cause of Action (*Exhibit AA*).

40.    VNB New York LLC has asserted in its Cross-Claim in the First and Second Causes of Action for conversion against New Liberty, a second Cross-Claim for conversion against Roni Rubinov, a third Cross-Claim against New Liberty and Roni Rubinov for negligence and the disposition of the pawned merchandise and has asserted counterclaims (*Exhibit BB*).

11

41.    New Liberty and Roni Rubinov have interposed an Answer denying the allegations
of the Complaint by the Trustee and asserting a series of Affirmative Defenses and denying the
allegations of the claims of VNB New York LLC (*Exhibit CC*).

Dated: New York, New York
May 14, 2019

Respectfully submitted,

***MATTHEW C. HARRISON, JR.,***
***CHAPTER 7 TRUSTEE-PLAINTIFF***

By:    /s/ *Leo Fox*
Leo Fox, Esq.
Attorney for Plaintiff-Trustee
630 Third Avenue – 18th Floor
New York, New York 10017
(212) 867-9595
leo@leofoxlaw.com

12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| VNB NEW YORK, LLC | Index No. 651926/2016 |
| Plaintiff | |
| | **AFFIDAVIT IN SUPPORT OF** |
| - against - | **APPLICATION FOR EX** |
| | **PARTE ATTACHMENT** |
| FRIEDA KONFINO, | |
| Defendant. | |

STATE OF NEW JERSEY,
COUNTY OF PASSAIC.

John Stine, being duly sworn, says:

1.       I am a Vice-President of Valley National Bank, agent for VNB New York, LLC, successor in interest by merger to VNB New York Corp. ("VNB") the holder of the note and guaranties that are the subject of the captioned action. I make this affidavit in support of VNB's motion against Frieda Konfino and Ronen Konfino (collectively, the "Guarantors") for an *ex parte* order of attachment pursuant to CPLR § 6201, or alternatively a hearing on VNB's request for an attachment, with a temporary restraining order pending the hearing.

**The Guarantors' Obligations to VNB**

2.       To evidence a $1,500,000 loan facility extended to A.N. Frieda Diamonds, Inc. ("ANF" or "Borrower"), ANF executed a Grid Note payable to VNB's predecessor in interest, The Merchants Bank of New York, A Division of Valley

1

National Bank dated March 24, 2006 (the "Grid Note"). A copy of the Grid Note is annexed as Exhibit A. VNB is the wholly owned subsidiary of Valley National Bank.

3.     As additional security for the repayment of the Grid Note, on December 19, 2008, the Guarantors executed an Unlimited Guaranty (the "Guaranty"), thereby personally and unconditionally guarantying full payment and due performance of all of ANF's obligations to VNB under the Grid Note. A copy of the Guaranty is annexed as Exhibit B.

4.     The Grid Note is secured by all of ANF's personal property, including ANF's Inventory and Accounts Receivable (as defined below), under certain loan and security documents, including a security agreement and properly filed UCC financing statements (the "Security Documents"). A copy of the Security Documents is annexed as Exhibit C.

5.     The Security Documents prohibit ANF from entering into any transactions concerning the Inventory that would or could create a lien or interest adverse to VNB's security interest. Security Documents, Exhibit C.

6.     The Grid Note provides that "the rate of interest shall be ½% per annum in excess of the prime commercial rate of the Bank, which rate shall be calculated on the basis of a 360 day year and shall be adjusted and effective at the opening of business on the date of each such change without notice to the Borrower or any endorser, surety, or guarantor, but in no event higher than the maximum permitted under applicable law." Exhibit A, p. 1.

#873210

7.    The Grid Note further provides that "[i]n addition, the Borrower will pay interest on any overdue installment of interest or principal for the period for which overdue, on demand, at a rate equal to 3% per annum above the rate of interest hereinabove set forth." *Id.*

8.    On May 7, 2010, ANF entered into a Modification Agreement, under which the amount of credit available to ANF under the Grid Note was increased to a maximum of $2,100,000. A copy of the Modification Agreement is annexed as Exhibit D.

9.    The Modification Agreement provides that "the Borrower and the lender agree that notwithstanding anything to the contrary in the Grid Note as of the date of this Agreement, the outstanding principal balance of the Grid Note, as modified hereby, shall bear interest at a per annum rate equal to One-Half Percent (.50%) above the Valley Prime Rate (as hereinafter defined)" and the "[Valley] Prime Rate means the rate per annum established by Valley National Bank from time to time as its Prime Rate, or, in its discretion, the base, reference or other rate designated by Valley National Bank for general commercial loan reference purposes. The [Valley] Prime Rate is not tied to any external rate of interest or index, and does not necessarily reflect the lowest rate of interest actually charged customers." *Id.*, Sections 1.5 and 1.6.

10.    Section 1.10 of the Modification Agreement further provides that "Notwithstanding anything to the contrary in the [Grid] Note, the interest rate on this Note is limited by a floor as follows: the minimum interest rate (i.e. floor) is 5.00% per annum." *Id.*

11.    A schedule of payments of principal and interest from the date of the Modification Agreement (May 7, 2010) through June 30, 2015 is set forth as Exhibit E.

12.    ANF's last payment of interest was made on June 9, 2015 for the interest period May 1, 2015 through May 31, 2015. No further interest payments have been made. *Id.*

13.    ANF's last principal payment of $20,000 was made on June 30, 2015, reducing the principal balance under the Grid Note from $1,855,000 to $1,835,000. *Id.*

14.    No further payments have been made.

**Dissipation of ANF's Assets**

15.    VNB performed a partial audit of ANF and the Collateral in May 2015 (the "Audit"). In the course of the Audit, ANF provided documents showing inventory valued at over $5,000,000 as of May 29, 2015 (the "Inventory") and accounts receivable valued at over $2 million as of December 2014 (the "Accounts"). See audit exhibits annexed as Exhibit F. VNB understood the Inventory was stored at ANF's premises and in a vault facility located at DGA Security Systems, 580 Fifth Avenue (the "DGA Box").

16.    An involuntary bankruptcy petition was filed against ANF on or about July 16, 2015. This was a default under the Guaranty.

17.    Ian Gazes was appointed interim bankruptcy trustee (the "Interim Trustee") and Matthew Harrison was subsequently elected permanent trustee (the "Trustee").

18.    Schedules filed by ANF in the Bankruptcy Court stated the Debtor, at the Petition Date of July 16, 2015 had Inventory of $1,000,000 and Accounts of $250,000. See Exhibit 5 to the accompanying Janovsky Affirmation (the "Janovsky Aff.").

19.    In or about September 2015, VNB was informed that Friend & Co. sent Inventory in its possession (the "Friend Inventory") to the Interim Trustee on or about September 18, 2015. The Friend Inventory was stored in a safe deposit box in the name of the Trustee at Valley.

20.    On or about January 28, 2016, along with the Trustee and a diamond appraiser, I examined the Friend Inventory at Valley. According to the appraiser, the value of the Friend Inventory was less than $50,000. See January 26 inventory, Ex. G.

### Amounts Owed

21.    The Valley Prime Rate was 4.5% through 12/16/15, then 4.75% from 12/17/15 to the present. Therefore, the rate of default interest of 8% (3% per annum above the contract rate of 5%) was in effect beginning on July 16, 2015 through December 16, 2016. The rate of default interest increased to 8.25% (3% per annum

above the contract rate of 5.25%) and was in effect beginning on December 17, 2015 through August 17, 2016.

22.    The calculation of interest due for the Grid Note from June 1, 2015 through August 17, 2016 is as follows:

### Note Rate

$1,855,000 (Principal balance from 6/1/15 through 6/30/15) multiplied by .05 (the note rate of interest) divided by 360 (resulting in a per diem of $257.64) multiplied by 30 (the number of days from 6/1/15 through 6/30/15) = $7,729.17.

$1,835,000 (Principal balance from 7/1/15 to 7/15/15) multiplied by .05 (the note rate of interest) divided by 360 (resulting in a per diem of $254.86) multiplied by 15 (the number of days from 7/1/15 through 7/15/15) = $3,822.90.

### Default Rate

$1,835,000 (Principal balance from 7/16/15 through 12/16/15 multiplied by .08 (the default rate of interest) divided by 360 (resulting in a per diem of $407.78) multiplied by 154 (the number of days from 7/16/15 through 12/16/15) = $62,798.12.

$1,835,000 (Principal balance from 12/17/15 through 8/17/16 multiplied by .0825 (the default rate of interest) divided by 360 (resulting in a per diem of $420.52) multiplied by 301 (the number of days from 12/17/15 through 8/17/16) = $103,027.40.

23.    As a result, the total accrued interest due on the Grid Note is $177,377.59 as of August 17, 2016, with interest accruing at the per diem amount of $420.52 ($1,835,000 multiplied by .0825 / 360).

24.    The total amount due for principal and interest as of August 17, 2016 is $2,012,377.50 with an additional $420.52 in accruing interest due each day thereafter, plus attorneys' fees in amount to be determined after severance of that claim from this action.

_____
JOHN STINE

Sworn to before me this
22 day of August, 2016

_____
Notary Public

ASHLEY CLARK
NOTARY PUBLIC OF NEW JERSEY
ID # 2452843
My Commission Expires 8/18/2020

#873210