**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                    :
                                                         :        **Chapter 7**
    A.N. Frieda Diamonds, Inc.,                          :
                                                         :        **Case No. 15-11862 (MEW)**
                Debtor.                                  :
-------------------------------------------------------------x
**MATTHEW C. HARRISON, JR.,**                            :
                                                         :
        **Trustee-Plaintiff,**                           :
                                                         :
            v.                                           :        **Adv. Pro. No. 17-01103 (MEW)**
                                                         :
**RONEN KONFINO, FRIEDA KONFINO,**                       :
**RONI RUBINOV, NEW LIBERTY PAWN**                       :
**SHOP, INC., NEW YORK ESTATE**                          :
**BUYERS and ABNER RUBINOV a/k/a**                       :
**AVNER RUBINOV,**                                       :
                                                         :
        **Defendants.**                                  :
                                                         :
**VNB NEW YORK, LLC,**                                   :
                                                         :
        **Defendant-Intervenor and**                     :
        **Cross-Claimant**                               :
-------------------------------------------------------------x

## <u>DECISION AFTER TRIAL</u>

A P P E A R A N C E S :

LEO FOX, ESQ.
New York, New York
    *Attorney for the Trustee-Plainfiff*

ZEICHNER ELLMAN & KRAUSE LLP
New York, New York
By:  Peter Janovsky, Esq.
        Stephen F. Ellman, Esq.
    *Attorneys for VNB New York, LLC*

PAUL J. SOLDA, ESQ.
New York, New York
    *Attorney for Roni Rubinov and New Liberty Pawn Shop, Inc.*

1

SHAFFERMAN & FELDMAN LLP
New York, New York
By: Joel M. Shafferman, Esq.
 *Attorneys for Avner Rubinov*

**HONORABLE MICHAEL E. WILES**
**UNITED STATE BANKRUPTCY JUDGE**

 Plaintiff A.N. Frieda Diamonds, Inc. ("**AN Frieda**") is the chapter 7 debtor in a case that

has been pending since 2015. The chapter 7 trustee, Matthew C. Harrison, Jr., contends that the

former principal of AN Frieda, Mr. Ronan Konfino, pawned diamonds and other items that were

owned by AN Frieda in transactions with defendant New Liberty Pawn Shop, Inc. ("**New**

**Liberty**"). The trustee further contends that New Liberty and its owner, Mr. Roni Rubinov,

improperly disposed of those items in violation of section 549 of the Bankruptcy Code and in

violation of various orders that I entered. The Trustee seeks damages in an amount to be

assessed by the Court but that have been described in the parties' Joint Pretrial Order as ranging

between $1,256,291 and $2,010,066.

 In his complaint, the Trustee also asserted a claim under section 547 of the Bankruptcy

Code to recover alleged preferences in the amount of $27,844. The complaint described the

preference payments as having been made to an entity named Roni Rubinov, Inc. A question

arose at trial as to whether that entity had ever properly been named as a defendant. I will

discuss that issue below.

 In addition to New Liberty and Mr. Rubinov, the Trustee has also sued an entity named

New York Estate Buyers, which is the entity to which New Liberty purportedly sold the items

that are the subject of this proceeding. Avner Rubinov, who is the owner of New York Estate

Buyers and who is the father of Roni Rubinov, has also been named as a defendant. The Trustee

contends, pursuant to section 550 of the Bankruptcy Code, that New York Estate Buyers and

2

Avner Rubinov are subsequent transferees of property of the estate that was wrongfully transferred, and that as subsequent transferees they are obligated to compensate the Trustee for the values of the items that were transferred to them.

The Trustee also sued the former owners of AN Frieda, who are two individuals named Ronen Konfino and Frieda Konfino. This Court has entered default judgments against Mr. and Mrs. Konfino and they did not participate in the trial.

VNB New York, LLC ("**VNB**") has intervened in the proceeding and has asserted cross-claims against all of the named defendants. VNB contends that it is a secured creditor and that VNB had a valid and perfected security interest in the items that belonged to AN Frieda and that Mr. Konfino delivered to New Liberty. VNB has asserted claims to recover damages for the improper disposition of its collateral, including claims of negligence, conversion, aiding and abetting of conversion and constructive trust. VNB has also asked for a ruling that its recovery rights are superior to the rights of the Trustee or of other parties.

New Liberty and Roni Rubinov admit that Mr. Konfino delivered diamonds and some other jewelry and watches to New Liberty and that some of the items probably belonged to AN Frieda. However, they argue that it is likely that many of the pawned items were the personal property of Mr. Konfino and his wife, and they suggest that the Trustee has not offered sufficient proof of ownership of each item. New Liberty and Roni Rubinov further argue that New Liberty sold the pawned items to New York Estate Buyers after giving notices of default and after the relevant redemption periods had expired, in each case in accordance with New Liberty's rights under New York State law and under the Bankruptcy Code. Roni Rubinov has testified that he did so without knowledge of AN Frieda's bankruptcy case, or of VNB's security interests, or of court orders in which I had barred parties from transferring property that belonged to AN Frieda.

Avner Rubinov and New York Estate Buyers are also defendants, as noted above. I entered default judgments against Avner Rubinov and New York Estate Buyers, but Avner Rubinov later moved to vacate the defaults. The parties resolved that motion by stipulating that the default judgments would remain in place "pending a determination of the merits of this Action." *See* PX 35, at ¶ 1. Avner Rubinov contends that neither he nor New York Estate Buyers ever purchased or received the diamonds that are at issue in this proceeding, and he has flatly contradicted his son's testimony on those points.

I denied a motion for summary judgment that was filed by New Liberty in July 2019. *See* ECF No. 138. I explained my reasons for doing so on the record after oral argument of the summary judgment motion. *See* Transcript, July 30, 2019, ECF No. 139.

### Jurisdiction

The parties agree I have subject matter jurisdiction over their claims and cross-claims, personal jurisdiction over the parties, and the statutory and constitutional power to render a final judgment. The parties reconfirmed those agreements at the outset of trial.

### Uncontested Facts

The following matters are not in dispute.

1.    Mr. Konfino delivered diamonds and other property to New Liberty pursuant to 135 separate pawn transactions during the period December 2013 through March 2015. New Liberty loaned $3,460,690 in those transactions. *See* Joint Pretrial Order ("JPO") (ECF No. 145), Stipulated Facts ¶¶ 11-12.

2.    As of May 2015, 44 of the 135 pawn transactions were still outstanding. New Liberty's loans in those transactions were in the principal amount of $1,005,033. New Liberty sent default notices with respect to the 44 open transactions on July 9 and 10, 2015. *Id.* ¶ 13.

The default notices stated that the pawned items would be sold unless they were redeemed within thirty days. *See* DX C.

3. This bankruptcy case began with the filing of an involuntary chapter 7 bankruptcy petition against AN Frieda on July 16, 2015. *See* PX 1.

4. On July 23, 2015, I issued an order that required the disclosure by AN Frieda of the location of all property belonging to AN Frieda. *See* Case No. 15-11862, ECF No. 10.

5. On August 6, 2015, an interim trustee was appointed with the consent of AN Frieda. *See* Case No. 15-11862, ECF No. 21; *see also* PX2 (Order, dated August 5, 2015). The Order appointing the interim trustee also directed AN Frieda "and any other person or persons" to "deliver forthwith to said Interim Trustee all of the property of the estate of whatsoever nature and description in the possession or control" of such person. *See* PX 2.

6. At some point the interim trustee learned that Roni Rubinov and/or New Liberty might be in possession of property belonging to AN Frieda. I issued an Order on August 14, 2015 that directed that "any third party, including, without limitation, Roni Rubinov, is directed to turn over to the Interim Trustee or his designee . . . any Assets in such third party's possession, custody or control." The Order made clear that any liens or security interests would remain in place notwithstanding any such turnover. *See* PX 3.

7. On August 18, 2015, the attorney for the interim trustee, David Dinoso, requested in writing that Roni Rubinov and New Liberty permit the interim trustee to take inventory of items in their possession that belonged to AN Frieda. The writing was directed to an attorney named Daniel J. Gotlin. *See* JPO, Stipulated Facts, ¶ 4; *see also* PX 4.

8. On August 18, 2015 Mr. Gotlin sent an email to the interim trustee's counsel, stating that he had just spoken to "my client" and that "[h]e is going through his records to

determine what if anything is still in his possession.  I hope to have an answer for you by tomorrow." *Id.*

9.  On September 2, 2015, the interim trustee filed a motion seeking a turnover by Roni Rubinov and New Liberty of property belonging to AN Frieda.  *See* Case No. 15-11862, ECF No. 31.

10.  On September 8, 2015 I entered an order for relief, granting the petition filed against AN Frieda and confirming the chapter 7 case.

11.  On September 16, 2015, I entered an order that granted the trustee's pending turnover motion and that directed Roni Rubinov and New Liberty, within one day, to turn over any property of the estate in their possession, custody or control and to provide an accounting for any disposition they had made of property that had been in their possession.  *See* PX 5.

12.  Matthew Harrison was subsequently elected as the permanent trustee.  He wrote a letter to Roni Rubinov and New Liberty dated December 2, 2015 to follow up on the prior court orders and to seek further information.  *See* PX 6.  Roni Rubinov contends that this was the first time that he became aware that a bankruptcy case had been filed or that this Court had issued the orders described above.

13.  Neither Mr. Rubinov nor New Liberty entered an appearance in AN Frieda's bankruptcy case in 2015 or submitted papers in connection with the foregoing matters.

14.  I received additional requests for relief by the Trustee in 2016.  On March 8, 2016 I entered a further Order directing an accounting by Mr. Rubinov and New Liberty.  *See* PX 7. By Stipulation of the parties the deadline for compliance was extended to April 19, 2016.  *See* ECF No. 108.

**Matters Decided at the Outset of Trial**

I held a four-day trial on October 25, 28, 29 and 30, 2019.  Transcripts have recently been prepared and filed and can be found at ECF numbers 154, 155, 156 and 157.  At the outset of the trial, and before hearing testimony, I decided certain motions *in limine* that the parties had made and also clarified some of the parties' contentions.

First, the Trustee had filed a motion in which he sought to amend the caption and the list of defendants to include Roni Rubinov, Inc. as a defendant with respect to the Trustee's preference action.  I noted that the title of the seventh cause of action in the complaint referenced a preference claim against Roni Rubinov, Inc., and that paragraph 58 of the Complaint referenced payments that had been made to Roni Rubinov, Inc.  However, the caption, and the list of defendants in the paragraphs 10 through 13 of the Complaint, did not list Roni Rubinov, Inc. as a defendant.  In addition, the prayer for relief did not identify Roni Rubinov, Inc. and did not even reference the purported seventh cause of action.

More importantly, the summons did not identify Roni Rubinov, Inc. as a defendant.  The Trustee offered no certificate of service or other evidence suggesting that Roni Rubinov, Inc. was a defendant or that service upon it had been completed.  Roni Rubinov, Inc. never entered an appearance.  Although the Trustee sought default judgments against other defendants who had failed to appear, no such judgment was sought as to Roni Rubinov, Inc.  It appears that all discovery and other proceedings in this case were conducted in ignorance of the fact that Roni Rubinov, Inc. had ever been identified as a potential party.  It was not until shortly before trial that the Trustee's counsel sought to correct the omission.

I noted at the outset of the trial that the two-year deadline for the assertion of a preference claim against Roni Rubinov, Inc. had passed.  *See* 11 U.S.C. § 546.  I also noted that none of the

papers that the parties had filed during the course of the case suggested that anyone believed that Roni Rubinov, Inc. had actually been named as a defendant.  I therefore denied the Trustee's application to add Roni Rubinov, Inc. as a defendant and to amend the caption.

Second, I noted that the Trustee had previously contended that even if Mr. Konfino acted on his own behalf when he pawned diamonds, and not on behalf of AN Frieda, that still left open the question of whether Mr. Konfino had wrongly taken those diamonds from AN Frieda, in which case New Liberty might be still liable under section 550 of the Bankruptcy Code as a "subsequent transferee" of property that Mr. Konfino had taken without adequate compensation. The Trustee confirmed that he was not pursuing such a claim, however, and that his only contention at trial was that Mr. Konfino had acted on behalf of AN Frieda and had pawned diamonds and other items that belonged to AN Frieda.

Third, the Trustee noted that he had tentatively reached an agreement with VNB regarding their respective claims and regarding a potential sharing of recoveries on their claims. During the course of the trial, though, there were suggestions that the agreement might have fallen apart, or at least that further discussions were needed.  It was not until very recently that the Trustee and VNB actually announced that they had reached an agreement.  I approved their agreement, without objection by any other party, by Order dated April 24, 2020.

Fourth, the Trustee argued in the Joint Pretrial Order that Ronen Konfino and AN Frieda were alter egos of each other, and therefore that the Trustee should be allowed to pursue claims against the defendants even if the defendants were successful in showing that the property they received belonged to Mr. Konfino and not to AN Frieda.  At trial, however, the Trustee's counsel confirmed, in response to my questions, that the Trustee was not pursuing that contention.

Fifth, the Trustee confirmed that he was not pursuing the third cause of action in the Trustee's Complaint, which alleged that the defendants had engaged in an intentional conspiracy to help Ronen Konfino and his wife to convert property belonging to AN Frieda.

Sixth, I denied a motion that New Liberty had filed, seeking to exclude testimony by certain diamond merchants who allegedly had provided some of the relevant diamonds to AN Frieda. I also denied motions by New Liberty and Avner Rubinov to exclude certain exhibits. I stated my reasons for those rulings on the record and it is not necessary to repeat them here.

## Pawnbroker Transactions Under New York Law

New York law permits a pawnbroker to engage in various activities. New Liberty's pawn tickets make clear that each of the transactions relevant to this adversary proceeding involved a loan of money based on a deposit and pledge of tangible personal property. *See* N.Y. Gen. Bus. Law § 52; DX 1 at p. 2. A pawnbroker is required to keep books and records that show the nature of the property pledged, the identity of the person who delivered the property, and whether that person acted on his own behalf or as an agent for another party. N.Y. Gen. Bus. Law § 43. Similar information must be contained in a pawn ticket that must be given to the person who delivers the pawned items. *Id.* § 44. In this case, each pawn ticket had terms and conditions printed on the reverse. Only one copy of such terms and conditions was put in evidence, see DX 2 at p. 2, but the parties stipulated that the same terms and conditions applied to each transaction.

"A duly licensed pawnbroker has a lien upon property pawned for the amount of the loan and interest, which entitles the collateral loan broker to hold the pawned article until payment or tender of the amount due." 10 N.Y. Jur. 2d, *Banks and Financial Institutions* § 986. New Liberty has acknowledged, however, that VNB's security interests had priority over New

9

Liberty's interests to the extent that the items belonged to AN Frieda and to the extent that VNB's security interests were perfected prior to the dates of the pawn transactions. *See* Defendant New Liberty Pawn Shop, Inc. & Ron Rubinov's Memorandum of Law in Opposition to Trustee's Motion and in Support of Defendants Motion (ECF No. 134) at 21.

A pawnbroker may charge interest up to 4% per month, though the transactions at issue in this proceeding involved interest rates of 3% per month. Pawned property must remain in a pawnbroker's possession for at least four months before a default may be declared. N.Y. Gen. Bus. Law § 48. If the pledgor does not pay the loan plus interest and redeem the property within four months, the pawnbroker has the right to declare a default and to issue a notice that the pawned property will be sold. No pawn or pledge may be sold unless such a notice has been sent at least 30 days prior to the sale date. *Id.* § 49(1).

New York law generally permits both "private" and "public" sales of defaulted pledges. N.Y. Gen. Bus. Law § 48. If a sale occurs, each pledge must be "individually offered for sale," regardless of whether a sale is public or private. N.Y. Gen. Bus. Law § 48(2). A public auction must be conducted by a licensed auctioneer. *Id.* If a private sale occurs, "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable" and also must be "conducted in conformity with applicable uniform commercial code provisions regarding the disposal of collateral after default." *Id*.

One UCC requirement with regard to the disposition of collateral after a default is that notice must be given to any other secured creditor who has perfected an interest in the collateral by the filing of a financing statement. *See* N.Y.U.C.C. §§ 610, 611. The purpose of such notice is to enable a senior secured creditor to assert its own rights to take possession of the collateral from the junior secured creditor, and to permit the senior secured creditor to control the

10

disposition of the collateral. *See* N.Y.U.C.C. 9-610, comment (5). New Liberty has argued that even if New Liberty was a junior creditor it still had rights under section 9-610 of the Uniform Commercial Code to dispose of the pawned items because New Liberty did not have actual knowledge of VNB's senior interests; that issue is discussed further below.

Any surplus following a sale (*i.e.*, any amount by which the proceeds exceed the secured claims) must be paid to the pledgor, and the pawnbroker is required to give notice of the surplus to the pledgor. *Id.* § 50(1). If there is a deficiency, however, the pawnbroker has no further recourse. The pawnbroker can look only to the value of the pawned items for reimbursement.

### Pawnbroker Transactions Under the Bankruptcy Code

The Bankruptcy Code also contains provisions that must be considered in evaluating New Liberty's rights with respect to the pawned items.

Section 541(b)(8) of the Bankruptcy Code provides that the term "property of the estate" does not include property that has been pledged for a loan if the debtor is not legally obligated to repay the loan or to redeem the property and if a timely redemption right has not been exercised as provided in applicable state law and in section 108(b) of the Bankruptcy Code. *See* 11 U.S.C. § 541(b)(8). This provision was added to the Bankruptcy Code in 2005. It does not explicitly refer to pawnbrokers but it is generally accepted that the provision was enacted with pawn transactions in mind. *See* 5 *Collier on Bankruptcy* ¶ 541.24 (16th ed.)

The parties agree that under New York law a person who obtains a loan from a pawnbroker has no legal obligation to repay the loan and no legal obligation to redeem the pawned item. The pawnbroker's sole recourse, if the item is not redeemed, is to sell the collateral. In that case the pawnbroker has no personal claim against the pledgor; it only has a claim against the pledged property. The conditions of section 541(a)(8) therefore are satisfied,

and section 541(a)(8) is applicable to any pawn transactions that involved property belonging to AN Frieda.

Both New York State law, and the automatic stay set forth in section 362 of the Bankruptcy Code, barred any sale of items belonging to AN Frieda before the expiration of the redemption period. *See* N.Y. Gen. Bus. Law § 49(1); 11 U.S.C. § 362(a)(3), (5), (6); *Schnitzel, Inc. v. Sorensen (In re Sorensen)*, 586 B.R. 327, 334-336 (9th Cir. 2018) (automatic stay barred affirmative action by pawnbroker to sell collateral while redemption rights remained outstanding). On the other hand, the only extension of the state law redemption period that is set forth is the Bankruptcy Code is the sixty-day extension provided in section 108(b). Most courts have held that if under state law a redemption period (as extended by section 108(b)) expires automatically during a bankruptcy case, without the need for additional action by the pawnbroker, the relevant property is not property of the estate. *Id.; see also Title Max v. Northington (In re Wilber)*, 876 F.3d 1302, 1315 (11th Cir. 2017) (if redemption period expires during the pendency of a bankruptcy case, the relevant items are not property of the estate); *In re Martin*, 418 B.R. 710, 712-13 (Bankr. S.D. Oh. 2009) (failure to redeem meant property was not property of the estate); *In re Hatman*, No. 309-05764, 2009 Bankr. LEXIS 2588 *6-7 (Bankr. M.D. Tenn. 2009) (automatic stay did not extend redemption period); *Cash Am. Adv., Inc. v. Prado*, 413 B.R. 599, 605-06 (S.D. Tex. 2008) (automatic stay did not prevent expiration of redemption period); *In re Mosher*, No. 07-60007-13, 2007 Bankr. LEXIS 4730 *21-22 (Bankr. D. Mon. 2007) (expiration of redemption period was not barred by the automatic stay and after expiration pawned items were not property of the estate); *see also In re Canney*, 284 F.3d 362, 372-3 (2d. Cir. 2002) (holding that the automatic stay only prevents affirmative acts and "the running of time is not one of those acts").

12

**Evidence at Trial**

Ten witnesses testified at trial, and more than 60 exhibits were admitted into evidence.

The witnesses were the following individuals:

- David Dinoso is an attorney who was counsel to the interim trustee in the AN Frieda case.  Mr. Dinoso testified that he had certain communications with Roni Rubinov and with an attorney whom Mr. Dinoso believed was acting for New Liberty, and that in those communications he informed those individuals of the bankruptcy filing and of certain orders that the Court had issued.

- Daniel Sklarrin, Mordechai Moradi and Mendel Wieder are merchants who testified about certain diamonds they said they had provided to AN Frieda.

- Russell Kranzler is a certified public accountant who testified about the Trustee's and VNB's damage calculations.

- Joseph Radice is the relationship officer at VNB bank.  He testified, among other things, about the perfection of VNB's liens and security interests.

- Matthew Harrison is the chapter 7 Trustee.  He testified about his investigation of AN Frieda's assets and transactions and about testimony that Mr. Konfino gave during meetings of creditors.

- Roni Rubinov is the owner of New Liberty.  He testified that he received various items from Mr. Konfino.  He did not deny that at least some of the diamonds he received probably belonged to AN Frieda, but he said he did not know which ones and that he believed it was likely that most of the diamonds, and certain other items he received, were the personal property of Mr. Konfino and of Mr. Konfino's wife. He also contended that after the periods expired for the redemption of the pawned

13

items he sold them to New York Estate Buyers.  He testified that he did so without knowledge of the AN Frieda bankruptcy case, VNB's security interests, or any court orders limiting the transfer of property belonging to AN Frieda.

- Harold Dambrot was an official with the National Pawnbrokers Association and with the New York State Collateral Loan Brokers Association.  He testified about certain practices in the pawnbroker industry.

- Avner Rubinov testified that New York Estate Buyers never purchased any of the diamonds or other property at issue in this proceeding, and contradicted the testimony of his son, Roni Rubinov, concerning those matters.

### Resolutions of Disputed Issues

Resolution of the parties' disputes requires the Court to determine:  (1) which (if any) of the pawned items belonged to AN Frieda at the times of the pawn transactions; (2) whether VNB held valid, perfected and prior security interests in AN Frieda's property; and (3) what rights the Trustee and VNB might have as to particular items that AN Frieda originally obtained "on memorandum" from other parties.  In addition, to the extent that the pawned items belonged to AN Frieda and/or to the extent the pawned items were collateral subject to VNB's security interests, the Court must also determine: (4) the extent of New Liberty's and Roni Rubinov's knowledge and awareness of the AN Frieda bankruptcy case, the Orders issued by this Court, and the existence of VNB's security interests; (5) whether (as they contend) Roni Rubinov and New Liberty disposed of pledged items in accordance with their rights under New York State law and under the Bankruptcy Code;  (6) the value (if any) of any property of AN Frieda, or collateral of VNB, that was improperly sold or otherwise disposed of; and (7) the nature of any judgments that should be entered.  I will review each of those issues separately.

I.    **AN Frieda's Interests in the Pawned Items.**

I have carefully reviewed the testimony at trial and also the excerpts from deposition testimony that the parties submitted as exhibits.  I have also reviewed the underlying pawn tickets and the information contained in the other exhibits that were offered into evidence.

There were 44 pawn transactions in which Mr. Konfino delivered property to New Liberty and in which the pawned items had not been redeemed at the time of the filing of the involuntary bankruptcy petition against AN Frieda.  In 42 of those instances the pawn tickets listed the names of both AN Frieda and Ronen Konfino as the party who pledged the relevant items.  Most listed "Konfino Ronen/AN Frieda Diamond Inc." as the pledgor, while others listed "Konfino Ronen/A.N. Frieda Diamond."  *See* Exhibit C to the Report of Russell Kranzler, PX 16.  Only two of the 44 defaulted pawn tickets listed Mr. Konfino's name without referencing AN Frieda.  *Id.*

I note that section 43 of the New York General Business Law requires pawnbrokers to maintain records showing not only the name and address of the individuals who present items for loans, but also "whether the pledgor claims to be the owner, consignee or agent of the owner." *See* N.Y. Gen. Bus. Law § 43.  In short, it was Roni Rubinov's obligation to make clear, in each pawn ticket, whether Mr. Konfino was acting on his own behalf or if he instead was acting on behalf of AN Frieda.  It is possible, of course, that Roni Rubinov made mistakes in fulfilling this duty, or that he was sloppy and inattentive in doing so.  But I may also consider this basic statutory obligation in assessing the records that New Liberty did keep and the significance of the statements contained in them.

Other evidence about ownership was inconclusive.  Evidence as to how (and by whom) particular items were acquired might have been convincing in deciding who owned the pawned

items, but very little such evidence was offered at trial.  The Trustee testified credibly that

information about AN Frieda's assets and transactions was supposed to be found on a computer

hard drive, but that the hard drive was damaged beyond repair and other records were not

available to permit a reconstruction of all of the property that AN Frieda owned.  However, the

Trustee's counsel was able to identify three diamond merchants who had provided some of the

property that was pledged.  Their testimony and the associated exhibits show that the items

covered by five of the 44 pawn tickets were items that belonged to AN Frieda, and that at least

some of the items covered by two other pawn tickets belonged to AN Frieda.

Many pledges were redeemed, and a consistent practice regarding the payment of

redemption prices might have indicated whether AN Frieda owned the items for which its name

appeared on pawn tickets.  But again, very little evidence was offered as to how the redemption

payments were made or as to the identities of the parties who made the payments.  There was

only one instance in which the nature of the redemption payment was revealed by the evidence.

The items covered by pawn ticket 3752 were redeemed by AN Frieda by check number 16404 in

the amount of $10,700, though for some unexplained reason the check was made payable to

"Midtown Watches."  *See* DX 2, at p. 77 of 86.  The Trustee suggested that certain payments that

AN Frieda made to "Roni Rubinov, Inc." were payments that were made to redeem pledges, but

no evidence to that effect was offered and no effort was made to tie the dates or amounts of those

payments to any particular pawn transactions.

Roni Rubinov speculated at trial that certain of the pawned items might have represented

"heirloom" properties that belonged to Mr. and Mrs. Konfino individually, based primarily on

the sizes and qualities of the diamonds or other items at issue.  However, Roni Rubinov's

testimony on those points was self-serving, and he admitted that his testimony just represented

16

an "educated guess" as to the ownership of those items.  I did not find his testimony about any of those items to be credible.

Roni Rubinov also testified generally that whenever he asked about specific items Mr. Konfino confirmed that the relevant items were "his" property.  However, at other times during his testimony Mr. Rubinov made clear that what Mr. Konfino actually said was that even when items belonged to AN Frieda, Mr. Konfino had the authority to pawn them because he was the owner of the company.  Actually, the admitted fact that Roni Rubinov had such conversations with Mr. Konfino, and the admitted fact that Roni Rubinov attempted (on at least some occasions) to confirm whether items belonged to AN Frieda or to Mr. Konfino, show that these were issues that were relevant to New Liberty and relevant to the pawn transactions.  They undercut Roni Rubinov's contention at trial that he did not really attempt to ascertain the ownership of each item and that AN Frieda's name appeared on pawn tickets merely because it was possible that AN Frieda might own some of the pledged items.

I find after considering the evidence that it is more likely than not that the property involved in three of the 44 relevant transactions belonged to Mr. Konfino and his wife personally, but that it is far more likely than not that the other 41 transactions all involved property that belonged to AN Frieda and not to the Konfinos personally.

The three transactions that involved property that more likely did not belong to AN Frieda were the transactions governed by pawn tickets numbered 2482, 2855 and 3434.

Pawn ticket number 2482 was dated December 30, 2013.  It involved a loan of $35,000 against a white gold engagement ring with stones having a total weight of 6.02 carats.  This pawn ticket was in the name of Ronen Konfino only.  There is no indication in the pawn ticket or in any of the other evidence before me that AN Frieda owned the property or had any rights with

respect to the transaction.  Roni Rubinov testified that he believed this item belonged to Frieda

Konfino.  The Trustee expressed an understandable skepticism, but he offered no actual evidence

to the contrary, and the mere possibility that it could have belonged to AN Frieda is not enough.

The preponderance of the evidence, including the wording of the pawn ticket, shows that Mr.

Konfino and/or his wife owned this particular item.

Pawn ticket number 2855 was dated June 6, 2014 and involved a loan against two items:

an Audemars Piguet watch and an "eternity band."  This pawn ticket also was in the name of

Ronen Konfino only, with no reference to AN Frieda.  Again, the Trustee's counsel expressed

skepticism about the ownership of this item, but that skepticism was not supported by any other

evidence, either in the wording of the pawn ticket or in other testimony or exhibits.  The

evidence may not have excluded the possibility that these items belonged to AN Frieda, but a

mere possibility is not enough.  The preponderance of the evidence, including the wording of the

pawn ticket, shows that Mr. Konfino and/or his wife owned these particular items.

Pawn ticket 3434 is dated December 15, 2014.  It involved a loan of $54,050 against a

rose gold Patek watch with a leather band.  This pawn ticket listed the names of both Mr.

Konfino and of AN Frieda.  The main business of AN Frieda was the purchase and sale of

diamonds, but the Trustee offered evidence that AN Frieda sometimes sold watches.  Frankly,

this was the only transaction that I thought presented a close call.  Mr. Rubinov testified that Mr.

Konfino was wearing the watch when he came to New Liberty's offices and that he had seen Mr.

Konfino wearing the watch on prior occasions.  I find after considering all of the evidence that

the preponderance of the evidence shows that Mr. Konfino owned this particular item,

notwithstanding the appearance of the AN Frieda name on the pawn ticket.

As to the other 41 transactions, however, I find based on the evidence that it is far more likely than not that the pawned items belonged to AN Frieda and not to Ronen Konfino or his wife.  Each of these 41 transactions involved one or more diamonds, or in a few cases jewelry (such as earrings) that included diamonds.  AN Frieda was in the business of buying and selling diamonds, and the evidence shows that to the extent Mr. Konfino and his wife engaged in that business they did so through AN Frieda and not in their own names.  Roni Rubinov admitted at trial, and also during his deposition testimony, that he was aware that Ronen Konfino was an owner of AN Frieda and that AN Frieda was in the business of buying and selling diamonds and diamond jewelry.  He also admitted that the reason why he started including the name of AN Frieda on the pawn tickets was that he had the impression that at least some of the items belonged to AN Frieda.

Roni Rubinov contends that he did not actually try to figure out at the time whether the property belonged to AN Frieda, and that in all likelihood much of that property did not belong to AN Frieda, but I find that his testimony on these points was not credible and is against the weight of the evidence, at least as to 41 of the 42 transactions that included the name of AN Frieda on the pawn tickets.  As noted above, New Liberty had an obligation under New York State law to make clear, on the pawn tickets, whether Mr. Konfino was acting for himself or as agent for another party.  I find after considering the evidence that the real reason why AN Frieda was listed on 42 of the 44 defaulted pawn tickets was that Roni Rubinov understood and believed that Mr. Konfino was acting on behalf of AN Frieda in those transactions.  Roni Rubinov's testimony to the contrary was not credible, with the exception of one transaction (pawn ticket 3434), which as described above involved a loan of $54,050 with the collateral consisting of a rose gold Patek watch with a leather band.

Given the admitted nature of AN Frieda's business, the nature of the collateral, and the inclusion of AN Frieda's names on the pawn tickets, the weight of the evidence shows that the items pawned in 41 of the 44 defaulted pawn transactions belonged to AN Frieda.

## II.     **VNB's Security Interests**.

Neither the Trustee nor the defendants were willing to admit the nature of VNB's security interests or the perfection thereof.  However, the evidence at trial left no room for any dispute. VNB offered credible and convincing evidence (including a security agreement and copies of UCC filings) as to the existence and perfection of its security interests, which extended to all of AN Frieda's rights and interests in personal property, including without limitation all of its inventory.  *See* CC XA.  The other parties did not challenge VNB's proof at trial.

Section 3.1 of the VNB Security Agreement made clear that the bankruptcy proceeding constituted an Event of Default.  *Id.* § 3.1.  The Security Agreement and New York law provided VNB with a right to take possession of its collateral upon such Event of Default.  *Id.* § 3.2; N.Y.U.C.C. § 9-609(a)(1).  Those rights were enforceable as between VNB and New Liberty, though with respect to AN Frieda such rights would have been subject to the automatic stay under the Bankruptcy Code while AN Frieda had a property interest in the items.

VNB's security interests were valid and were perfected prior to the date of any of the 41 pawn transactions that involved property delivered on behalf of AN Frieda.  Under New York State law, VNB's prior perfected claims had priority over any secured rights that New Liberty might have claimed based on the pawn transactions.  New Liberty did not contend otherwise at trial.

Other defenses that New Liberty asserted regarding its rights as a pawnbroker and regarding its rights *vis-à-vis* VNB are discussed in Parts III and IV, below.

20

III.    **AN Frieda's and VNB's Interests In Items Obtained "On Memorandum."**

The only issues presented at trial with respect to most of the pawned items were as to whether they belonged to AN Frieda or instead belonged personally to Mr. Konfino and his wife. However, the Trustee offered evidence that eight particular items were obtained by AN Frieda in "memo" transactions with other diamond merchants.  The Joint Pretrial Order did not indicate that the parties intended to dispute whether these should be treated as items that constitute "property of the estate" and/or whether they were subject to the secured claims of VNB.  At various times during the trial, however, New Liberty's counsel suggested that property obtained "on memo" did not actually belong to AN Frieda.

"Memo" transactions are common in the jewelry business.  The testimony at trial explained that a "memo" transaction permits one party to hold an item for a specified period of time while the party seeks a buyer.  The holder may return the item if it is not sold.  Conversely, the holder pays for the item if a sale is made or if the item otherwise is not returned.

The witnesses who testified about memorandum transactions in this particular case also testified that, with one exception, those transactions were converted to "sales" for which invoices were issued prior to the filing of the involuntary bankruptcy petition against AN Frieda.  Mr. Sklarin confirmed that this was the case as to the one item he provided "on memorandum," and Mr. Moradi testified that he invoiced AN Frieda for the items he had provided on memorandum (and that AN Frieda's check for the items had bounced).  As a result, there is no issue as to AN Frieda's ownership interests in the pawned property with the possible exception of one diamond that AN Frieda had obtained "on memorandum" from MMW Diamonds.

There is often a large difference between the actual legal rights of the parties to a "memorandum" transaction and what those parties may think their rights are.  The memorandum

transactions that were described at trial constituted consignments for purposes of the Uniform

Commercial Code.  The term "consignment" is defined in Section 9-102(a)(20) of the New York

Uniform Commercial Code as follows:

> "Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
>
> (A)  the merchant:
>
> (i)  deals in goods of that kind under a name other than the name of the person making delivery;
>
> (ii)  is not an auctioneer; and
>
> (iii)  is not generally known by its creditors to be substantially engaged in selling the goods of others;
>
> (B)  with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
>
> (C)  the goods are not consumer goods immediately before delivery; and
>
> (D)  the transaction does not create a security interest that secures an obligation.

*See* N.Y.U.C.C. § 9-102(a)(20).  In this case, the evidence showed that AN Frieda was a

"merchant" who dealt in diamonds and other jewelry; that it dealt in goods in its own name and

not in the names of its consignors or other persons; that it was not an auctioneer; and that it was

generally known to be trading its own merchandise for its own account and benefit, and not on

behalf of others.  The items involved in each "memorandum" transaction exceeded $1,000 in

value.  The goods transferred by "memorandum" were not "consumer goods" because they were

acquired for purposes of sale; they were not held by the consignors or by AN Frieda for personal,

family or household purposes.  *Id*. § 9-102(a)(23).  Finally, the goods were not transferred to AN

Frieda as security for an obligation owing to AN Frieda by another merchant.

22

Where the foregoing criteria are satisfied a transaction is deemed to be a secured credit

transaction. *Id.* §§ 1-201(b)(35), 9-103(d).  The consignor retains a purchase money security

interest, *id.* § 9-103(d), but that interest must be perfected in order to be enforced against other

creditors.  *See generally* 1 The Law of Secured Transactions Under the UCC § 1.06 (3d ed.

2019).  If another creditor has a floating lien on a merchant's inventory the consignor's purchase

money security interest is junior to that inventory lien unless, among other things, the consignor

(1) files a UCC Financing Statement before delivering the goods to the merchant, and (2)

provides notice of the consignment to the other secured creditor.  N.Y.U.C.C. § 9-324(b).

In addition, if the consignor has not perfected its purchase money security interest then

the consigned goods are subject to the claims of the consignee's creditors generally.  *Id.* § 9-

319(a).  Any unperfected security interest is also unenforceable during a bankruptcy case, and a

bankruptcy trustee has the same rights with respect to the consigned goods that a creditor of the

debtor would have.  *See* 11 U.S.C. §544.  In the absence of a perfected purchase money security

interest, then, consigned goods are treated as property of the estate, and the consignor merely has

an unsecured creditor claim against the debtor.  *See In re G.S. Distrib.,* 331 B.R. 552, 561

(Bankr. S.D.N.Y. 2005); 5 *Collier on Bankruptcy* ¶ 5441.05[1][b].

For the foregoing reasons VNB's security interests extended to all property obtained by

AN Frieda "on memorandum," and the Trustee has the same rights to recover such property as

he has to recover other property of AN Frieda.

New Liberty argues that it has special protections under the General Business Law

against the rights of the persons who provided items "on memorandum" to AN Frieda.  Section

44(3) of the General Business Law states:

> Notwithstanding any general, special or local law or ordinance to the
> contrary, if a collateral loan broker in good faith and without knowledge

> extends credit on a loan, the collateral for which was entrusted to the pledgor
> on consignment or was entrusted by a merchant dealing in goods of the kind
> pledged to the pledgor who was a merchant dealing in goods of the kind
> pledged, the collateral loan broker shall be required to relinquish the
> collateral to the legal owner provided the amount of the loan and interest due
> is paid.

*See* N.Y. Gen. Bus. Law § 44(3). However, by its terms this section applies in the event that

claims are made against New Liberty by another merchant (*i.e.,* one of the parties who provided

items to AN Frieda in a memorandum transaction). I do not have any claims before me by such

merchants, and I have no reason to decide whether any of those persons might have been able to

assert claims against New Liberty.

New Liberty has suggested that section 44(3) of the General Business Law also protects

New Liberty against claims by VNB, but that is plainly wrong. VNB is a secured creditor; it

does not claim to be an "owner" of the collateral and it does not assert a claim of the kind that is

addressed in section 44(3). In addition, New Liberty at all times had constructive knowledge of

VNB's security interests, because those interests were set forth in a valid UCC financing

statement. *See* Richard C. Tinney, Annotation, SUFFICIENCY OF DESCRIPTION OF COLLATERAL IN

FINANCING STATEMENT UNDER UCC § 9–110 AND 9–402, 100 A.L.R.3d 10 § 2[b] (2013) (stating

that a financing statement serves to perfect a security interest and to make that security interest

"enforceable against all of the world by giving notice to all the world of its possible existence"

and imposes on a potential creditor or purchaser of personal property "a duty to investigate to

determine whether the item or items that he plans to accept as collateral or to purchase are

encumbered by a prior security interest"); *see also Beneficial Fin. Co. of New York v. Kurland

Cadillac-Oldsmobile, Inc.,* 32 A.D.2d 643, 645, 300 N.Y.S.2d 884, 887 (App. Div. 2d Dept.

1969) (noting that the purpose of notice filing is to protect a creditor by providing "fair warning"

that an investigation should be conducted); *Bank of Utica v. Smith Richfield Springs, Inc.,* 58

Misc.2d 113, 114, 294 N.Y.S.2d 797, 799 (Sup.Ct. Oneida Co. 1968). (asserting that notice filing

puts the general public on notice of a prior interest in collateral and that an that inquiry should be

made).  Even if section 44(3) were applicable, then, New Liberty would not be able to show that

it was "without knowledge" of VNB's senior security interests.

**IV.**    **New Liberty's Knowledge of the Bankruptcy Case and the Court's Orders.**

Mr. Dinoso testified credibly that he spoke personally to an individual who identified

himself as Roni Rubinov during the second half of August 2015.  He called Roni Rubinov after

the entry of the August 14, 2015 order that referred specifically to Mr. Rubinov.  *See* PX 3.  Mr.

Dinoso also testified that he mailed copies of the August 14 order to Roni Rubinov and New

Liberty.

Mr. Dinoso further testified that he was referred to an attorney named Daniel Gotland as

an attorney acting for New Liberty, and that he had one phone call and exchanged a number of

emails with Mr. Gotland in the latter half of August 2015.  As I noted above, the parties have

stipulated that Mr. Dinoso sent an email to Mr. Gotlin dated August 18, 2015, and Mr. Gotland

sent an email response that same day in which Mr. Gotland stated that his client was

investigating to determine what property it held.  Mr. Dinoso recalled that at some point later in

August Mr. Gotland told him that the collateral had been sold, at which time Mr. Dinoso advised

Mr. Gotland of VNB's security interests.

Roni Rubinov testified that he had no communications with anyone representing the

Trustee, and no other communications about a bankruptcy filing for AN Frieda, until

approximately late November or December 2015.  Under cross-examination, however, he

corrected himself and admitted that some communications took place in August, with follow-up

communications in late November or December.

Roni Rubinov also testified that he did not hire Mr. Gotland to represent him in connection with AN Frieda, but that testimony was not credible. Roni Rubinov admitted elsewhere in his testimony that Mr. Gotland had been his counsel on prior occasions, and the August 18, 2015 email plainly shows that Mr. Gotland was acting as counsel to New Liberty when Mr. Gotland communicated with Mr. Dinoso.

I find based on the evidence that Mr. Gotlin was acting as counsel to New Liberty and that Roni Rubinov and Mr. Gotlin were aware of the AN Frieda bankruptcy filing, and of this Court's August 14, 2015 Order, no later than August 18, 2015.

For the reasons state above, New Liberty was at all times on constructive notice of VNB's security interests. I further find that Mr. Dinoso informed Mr. Gotlin of the existence of VNB's prior secured interests, and that New Liberty and its representatives therefore had actual knowledge of those interests, no later than August 31, 2015.

## V.    New Liberty's Dispositions of AN Frieda's Property.

New York State law generally permits pawned items to be sold in a private sale or at a public auction. If a public auction is held then certain notices must be published. In the case of a private sale, section 48 of the General Business Law requires that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable and conducted in conformity with applicable uniform commercial code provisions regarding the disposal of collateral after default." *See* N.Y. Gen. Bus. Law § 48.2. After any sale (whether private or public) the surplus – that is, any excess of the sale proceeds over the redemption prices – is payable to the pledgor. *See* N.Y. Gen. Bus. Law § 50.

In this case, notices of default were dated July 9 and 10, 2015. Under New York law, and under the terms of the default notices, AN Frieda had the right to redeem pledged items within

26

30 days after the delivery of the default notices.  However, that thirty-day redemption period had

not expired as of the filing of the involuntary chapter 7 petition on July 16, 2015.  Section

541(b)(8) of the Bankruptcy Code recognizes that the applicable state law redemption period is

subject to extension pursuant to section 108(b) of the Bankruptcy Code.  Section 108(b) states

that if nonbankruptcy law fixes a deadline within which a debtor must cure a default or to take

other similar action, and if that deadline has not expired "before the date of the filing of the

petition," then the deadline automatically is extended to a date that is sixty days after the entry of

an "order for relief."  *See*  11 U.S.C. § 108(b).

The order for relief was entered in the AN Frieda bankruptcy case on September 8, 2015.

That means that the redemption period did not actually expire until sixty days later, on

November 7, 2015.

New Liberty contends that it actually disposed of the pledged collateral in five separate

transactions.  It alleges that the buyer in each of these five transactions was New York Estate

Buyers.  The purported transactions occurred on August 10, August 15, August 25, September 15

and September 29, 2015.  With respect to each of the 41 transactions that are relevant here the

purported sales price for each pawned item was simply set at a figure that was 103% of the

principal amount of the original loan.[1]  New Liberty contends that these purported sales to New

York Estate Buyers were commercially reasonable "private sales" of collateral that complied

with the requirements of New York State law and that were valid under section 541(b)(8) of the

Bankruptcy Code.  I reject these contentions for a number of separate reasons.

---

[1]    The only two instances in which the sales price was *not* equal to 103% of the loan amount
were with respect to the two transactions that were listed solely in the name of Mr. Konfino.
Those sale prices were 108.01% and 100.5%, respectively, of the original loan amounts.

First, I find based on the evidence that New Liberty never actually did sell any of the relevant items to New York Estate Buyers. I found the testimony of Avner Rubinov to be credible on this point, and I found the testimony of Roni Rubinov to be not credible. The only evidence of the purported sales consists of five "purchase orders" that are written on forms that New York Estate Buyers used. There are no signatures on the purchase orders. There are no invoices, no documents signed by New York Estate Buyers, and no evidence that the purported purchase prices were ever paid. The evidence showed that Roni Rubinov had access to the purchase order forms and to other papers belonging to New York Estate Buyers. I find that the transactions were fictitious. They were fabricated by Roni Rubinov for the purpose of concealing what actually happened to the pawned items. I find, too, that the purported sales involved fictitious prices. The purported prices were set at an arbitrary point that was 3% above the original principal amount of the loans and thereby were guaranteed not to cover the accrued interest, which accrued at the rate of 3% per month. I find that the purpose of fixing these arbitrary prices was to try to evade other parties' rights to receive the difference between the actual sale value of the pledged items and the amounts owing to New Liberty, and so that Roni Rubinov and/or New Liberty could take any and all such extra value for themselves.

Second, the purported sales (even if they occurred) all took place prior to the expiration of AN Frieda's redemption rights. As explained above, the redemption period did not actually expire until November 7, 2015. If sales occurred, they were in violation of New York State law and of the provisions of the automatic stay.

Roni Rubinov contends that he was not aware of the bankruptcy filing and of the effect of section 108(b), but even if that were true it would not matter, because the provisions of section 108(b) apply automatically. Furthermore, any sales of pawned items before the redemption

periods expired, and while they were still property of the estate, violated the automatic stay and were void, regardless of whether New Liberty had knowledge of the bankruptcy case. *In re 48th St. Steakhouse, Inc.*, 835 F2d 427, 431 (2d Cir 1987) ("actions taken in violation of the stay are void and without effect" (citation omitted); *In re Enron Corp.*, 300 BR 201, 212 (Bankr S.D.N.Y. 2003) (actions violative of the automatic stay are void and of no effect "even where the acting party had no actual notice of the stay"); *Federal Ins. Co. v. Sheldon*, 150 B.R. 314, 319 (S.D.N.Y.1993) (stating that "actions taken in violation of the stay are void even where the acting party had no actual notice of the stay").

In addition, as noted above I have found that Roni Rubinov, and New Liberty's counsel, were aware of the bankruptcy filing and of my orders by no later than August 18, 2015, and even by their own accounts three of the purported sales took place after that date. I have also found for the reasons stated above that the two purported private sales that allegedly took place on August 5 and August 15 did not actually occur. They were fictitious transactions as I have already explained.

Third, the sales occurred without proper regard to the prior secured claims of VNB. Section 9-611(c)(3)(B) of the New York Uniform Commercial Code required that New Liberty give notice of a sale to any secured creditor who held a lien on the collateral that had been perfected by the filing of an appropriate financing statement. N.Y.U.C.C. § 9-611(c)(3)(B). There is no dispute here as to VNB's security interest, or as to its filing of a proper financing statement, or as to the fact that the financing statement was on file long prior to the relevant pawn transactions and prior to the sales of collateral that purportedly occurred.

New Liberty and Roni Rubinov contend that they were not actually aware of VNB's perfected security interests, but even if that had been the case it was only because, by their own

admission, they never bothered to check to see if a UCC financing statement was on file. As already explained above, the filed financing statement is deemed under New York law to constitute valid notice to other creditors. "Notice filings" would be meaningless if a creditor such as New Liberty could defeat the perfected rights of a senior creditor just by refusing to investigate and thereby deliberately avoiding actual knowledge of a senior secured claim that is readily ascertainable.

Fourth, the purported sales (even if they occurred) were not at commercially reasonable prices.[2] By his own admission Roni Rubinov set prices that were tied to the original loan amounts rather than to the actual market values of the pawned items. He said that he did so because he thought those prices were fair, but he also admitted that he himself was not qualified to assess the current values of diamonds. When he needed an estimate of a diamond's value, he usually asked his father. I find that in these instances he never did so. Avner Rubinov's testimony was credible, and Roni Rubinov's was not. I therefore find that even if the purported sales to New York Estate Buyers had occurred, the fact that the sales prices were arbitrarily tied only to the principal amounts of the underlying loans, without any market testing and at levels that were guaranteed to provide no surplus recovery for AN Frieda, was not commercially reasonable.

Fifth, the purported sales (even if they had occurred) would not have been commercially reasonable because they did not occur pursuant to arm's length negotiations with an independent

---

[2]    New Liberty also purported to sell items in a "private sale." New York law requires a pawnbroker to give notice (in a pawn ticket) that items may be subject to a public auction or a private sale. See N.Y. Gen. Bus. Law § 44(2). New Liberty's pawn tickets only mentioned the possibility of a "public auction," raising an issue as to whether New Liberty was barred from conducting a private sale because it failed to disclose that possibility in its pawn tickets. However, the purported sales were so clearly not "commercially reasonable" in other respects that it is not necessary to decide this point.

party.  Even if Roni Rubinov had sold the items to his father at favorable prices, for the purpose

of giving his father a good deal and without exploring other options, that would not have

constituted a commercially reasonable disposition of the pledged items.

Sixth, I issued restraining orders that barred third parties from disposing of items owned

by AN Frieda and that required them to turn over property they held to the interim trustee.  I

issued such an order on August 5, 2015, and I issued another similar Order on August 14, 2015.

The August 14, 2015 specifically commanded Roni Rubinov to turn over property.  I have found

based on the evidence that New Liberty and its counsel were aware of the AN Frieda bankruptcy

and of the issuance of the foregoing orders no later than August 18, 2015.  I also find based on

the evidence that no actual sales had occurred by that date, and that the two purported sales to

New York Estate Buyers that allegedly preceded August 18, 2015 never actually occurred.

The orders that I issued plainly barred any further action by Roni Rubinov and by New

Liberty.  If they thought my orders contravened rights that New Liberty had under New York

State law or under the Bankruptcy Code, they could and should have sought relief.  They were

not free simply to disregard the clear terms of the orders that I issued.  And if they thought

somehow that they could succeed later in contending that items did not belong to AN Frieda,

they acted at their peril.

New Liberty has also argued that it should be free from liability because the trustee in

this case did not formally assert a redemption right prior to the November 7, 2015 expiration of

such rights.  However, the interim trustee's applications for temporary restraining orders, and the

turnover motion that the interim trustee filed in early September 2015, plainly were demands that

the property of AN Frieda be returned to the estate.  My Order directing Roni Rubinov and New

Liberty to deliver property to the interim trustee also perfected the trustee's assertions of the

estate's rights to a return of the property. I find that the Trustee's demands, and my orders, were sufficient to assert and to preserve any and all redemption rights of the estate.

In addition, if New Liberty thought that the estate was not entitled to a return of the property without the payment of a redemption amount, then New Liberty could and should have said so in response to the orders and motions that were served upon it. Instead, New Liberty lied about what had happened to the property and lied about the property that remained in its possession. New Liberty and its attorney advised the trustee, in late August 2015, that all of the items had been sold, which turned out not to be true even under New Liberty's own version of events. New Liberty's deceptions and misconduct were designed to deter the trustee from taking further actions to redeem the relevant property and to enforce the orders I had issued. Under the circumstances New Liberty is estopped from asserting that the estate failed to take timely action to redeem the pawned items. *Coggins v. County of Nassau*, 615 F.Supp.2d 11, 22 (E.D.N.Y.2009) (noting that "one party in a dispute should not be permitted to reap any benefit from its own misrepresentations"); *Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 81-82, 430 N.Y.S.2d 179, 187 (4th Dep't 1980) (noting that estoppel prevents a party from denying its own "admission which has in good faith been accepted and acted upon by another").

New Liberty has also argued that VNB cannot enforce its own security interests because VNB did not demand, prior to the purported sales, that possession of the collateral be turned over to VNB. By statute, however, it was New Liberty's obligation to give notice to VNB before any disposition of the collateral. The evidence showed and New Liberty did not do so. New Liberty cannot rely upon its own failures to comply with statutory obligations in an effort to defeat the legitimate claims of VNB.

VI.    **Values of the Relevant Items**.

The next issue is to determine the value of the pawned items that belonged to AN Frieda.
The best way to determine those values would have been to have actual, arm's-length sales of the
items in 2015. However, New Liberty made that impossible. New Liberty invented fictitious
sales, denied the trustee access to the relevant property, and kept no accurate and credible
records showing what actually happened to the pledged items.

During the trial, the parties referred to various industry guides that are normally used by
merchants as a starting point in calculating wholesale and retail values of diamonds. The guides
apparently are based on various characteristics of the diamonds. They presumably could have
provided some indications of the likely values of the pawned items in this case. Curiously,
however, the parties offered little evidence as to what these guides said as to the values of the
pledged items.

New Liberty cited to prior statements by Mr. Konfino as to the values of items he had
pledged to various parties and argued that I should find, based on those statements, that the
amount of pawned property that belonged to AN Frieda (and its actual value) was relatively low.
But Mr. Konfino's statements varied widely. There was no evidence that any of his statements
were based on actual, accurate records, and I did not find them credible or persuasive.

Most of the evidence offered by the parties about the values of the pledged items had to
do with the "loan to value" ratio that New Liberty used in making loans. Since the underlying
principal loan amounts are known, the parties contended that these ratios could be used to
compute the values of the pledged items. Roni Rubinov contended that he usually made loans in
a principal amount that was equal to 80% of what he estimated to be the sale value of an item.
The Trustee offered evidence as to certain diamonds that AN Frieda had initially obtained "on

33

memo" from other dealers.  There were some instances in which diamonds that were subject to

such "memo" transactions were combined with other collateral in a single pawn transaction, so

that the "memo" prices could not be directly compared to the "loans" provided by New Liberty.

But there were five transactions where a direct comparison was possible, and in those

transactions (pawn numbers 3341, 3602, 3624, 3625 and 3633) the New Liberty "loan" amounts

ranged from 50.9% to 70% of the "memo" prices.  There was one other transaction (pawn ticket

number 3705) for which "memo" prices were available for only some items, but the total loan

amount was less than 62.78% of the value shown just on those memo transactions.

The parties also offered relatively inconclusive testimony as to practices in the

pawnbroker industry generally, which confirmed that pawnbrokers usually lend at a range that is

between 50% and 80% of value in the case of diamonds.  That testimony showed that different

pawnbrokers used different practices, but my required task here is to determine what New

Liberty actually did.  General testimony about industry practices (and evidence of what some

other pawnbrokers did) was not helpful in answering that question.

On the one hand, the burden of proving the values of the diverted collateral rests with the

trustee and with VNB as the plaintiffs in this matter.  On the other hand, as noted above, it was

New Liberty that diverted the pawned items, invented fictitious transactions and fictitious sale

prices, and disclosed no credible records or other evidence as to what actually happened to the

pledged items.  It is appropriate under these circumstances that New Liberty bear the burden of

any uncertainties in the evidence as to what the actual values of the pledged items were.  *See*

*Chase Int'l, Ltd. v. Fashion Assocs, Inc.*, 425 F.Supp. 234, 238 (S.D.N.Y. 1977) (citing "the

well-known and ancient doctrine that when a party frustrates proof of damages, either by

withholding facts or through inaccurate record-keeping, any doubts about the actual assessment

34

of damages will be resolved against that party, and the fact-finder may calculate damages at the

highest reasonably ascertainable value"); *Landstar Sys., Ind. v. Am. Landstar Logistics Corp.*,

15-CV-7179 (KAM), 2019 WL 1199389, at *2 (E.D.N.Y. Mar. 13, 2019) (same).

I find on the basis of the evidence that New Liberty normally made loans in an amount

that was 70% of actual sales value.  I do not find it credible to think that New Liberty used an

80% loan-to-value ratio, given the high interest accruals (3% per month) and the fact that New

Liberty's only recourse, if the collateral was not redeemed, was as to the value of the collateral

itself.  Some of the "memo" transactions would support a finding that a lower loan-to-value ratio

may have been used, but in considering all of the evidence I find that the 70% figure is the

appropriate one to use in calculating damages.

The principal loan amounts in the 41 transactions that involved AN Frieda's property

totaled $898,608.  If those amounts represented 70% of the values of the pledged items, then

those pledged items had a total value of $1,283,725.71.  I find based on a preponderance of the

available evidence that this was the actual total value of the items that were the subject of the 41

pawn transactions that involved property of AN Frieda.

## VII.    **Judgments to be Entered.**

New Liberty has not disclosed what actually happened to the pledged items, but plainly

those dispositions – whether the items were sold to New York Estate Buyers or to others – were

not accidental.  They occurred pursuant to a deliberate exercise of dominion and control over the

pledged items.  New Liberty was on constructive notice of the prior security interests of VNB.

New Liberty also knew of the bankruptcy petition and of my restraining orders, and its counsel

should have known that under section 108(b) the redemption periods under New York law had

not expired.

In a normal case the remaining question before me would be to decide whether the foregoing facts give rise to a right of recovery.  Here, however, I have the unusual situation in which two parties (VNB and the Trustee) essentially seek to recover the same property (or, in lieu of recovering that property, damages for the improper disposition of that property).  If both VNB and the Trustee are entitled to the entry of judgment, I will also need to decide the relative priorities of VNB's and the Trustee's claims.

A.    **VNB's Claims.**

The disposition by a junior creditor of collateral in which another creditor has a valid and perfected lien constitutes conversion of the senior creditor's interests in the collateral.  *See Bank of India v. Weg & Myers, P.C.*, 257 A.D.2d 183,   (1st Dept. 1999); *TMMB Funding Corp. v. Associated Food Stores, Inc.*, 136 A.D.2d 540 (2d Dept. 1988) (creditor sold collateral without notice to another secured creditor); *see generally* 1A *Secured Transactions Under the UCC* § 7G.02 (2020); *Chen v. New Trend Apparel, Inc.*, 8 F.Supp.3d 406, 420-21 (S.D.N.Y. 2014) (although denying summary judgment, recognizing that a party with a perfected first priority security interest has a superior right to other parties in collateral and that a party that interferes with a secured creditor's ability to exercise its rights in the property could be liable in conversion; *see also Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-404 (2d Cir. 2006) (noting that New York recognizes conversion as "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights"); *Schulz v. Dattero*, 104 A.D.3d 831, 833, 961 N.Y.S.2d 308, 312 (noting that a plaintiff may recover for conversion if it has "an immediate superior right of possession to a specific identifiable thing" and the defendant exercised unauthorized control over it "to the exclusion of the plaintiff's rights).

36

New Liberty has argued that it lacked actual knowledge of VNB's security interests, but as explained above I have found that New Liberty was aware of VNB's interests no later than August 31, 2015. I find that the purported sales to New York Estate Buyers did not occur and that the pledged items had not been sold as of August 31, 2015. In addition, for the reasons stated above New Liberty was at all times on constructive notice of VNB's senior security interests. New Liberty's deliberate dispositions of the collateral, despite such constructive notice, constituted a conversion of property for which VNB is entitled to recover. *See TMMB Funding Corp., supra,* 136 A.D.2d 540 (creditor claimed lack of actual knowledge based on alleged defect in the naming of the debtor in a UCC financing statement, but the court held that the statement was sufficient to provide constructive notice and therefore that the senior creditor's claim for conversion had been established).

The evidence at trial showed that VNB's secured claim was in the principal amount of $1,835,000 as of June 30, 2015. VNB alleged that its secured claim should also include interest, default interest, attorneys' fees and collection expenses, but VNB offered no evidence as to what those amounts are. The agreements with AN Frieda provided for interest accruals at floating rates equal to a certain amount above VNB's prime rate, but no evidence was offered as to what those prime rates were and therefore the evidence does not permit the Court to make an interest calculation.

Even if VNB's claim were $1,835,000 as of September 2015, however, that claim still exceeded the value of the collateral ($1,283,725.71) that New Liberty held. In the absence of other facts this would entitle VNB to the entry of judgment on its conversion claim in the amount of $1,283,725.71. However, the trustee and VNB have recently stipulated that VNB obtained a partial recovery from Frieda Konfino through proceedings that were conducted in Israel, and that

the allowed amount of VNB's secured claim has been reduced to $1,242,722.07.  Again, it does

not appear that any interest was included in this calculation.  I will take judicial notice of this

stipulation as to the amount of VNB's claim.  If the unpaid debt owed to VNB is only

$1,242,722.07 (as it has stipulated with the Trustee), then the damages on its conversion claim

against New Liberty and Roni Rubinov cannot exceed that figure.

VNB has also claimed that Roni Rubinov should be liable for conversion or for aiding

and abetting a conversion of property.  The evidence at trial showed that Roni Rubinov

controlled the collateral and actively misrepresented what happened to it.  Whether he did so to

benefit himself directly, or whether he did so to benefit himself indirectly as the owner of New

Liberty, does not matter.  Roni Rubinov was the individual who committed the tortious acts and

it is appropriate to hold him liable as a result.  *Mayfield v Asta Funding, Inc.*, 95 F. Supp 3d 685,

701 (S.D.N.Y. 2015) (denying motion to dismiss claims against individual defendants where the

complaint "[s]ufficiently pleaded the individual Defendants' personal participation in deceptive

business practices prohibited by the General Business Law"); *Nat'l Survival Game, Inc. v.

Skirmish, U.S.A., Inc.*, 603 F. Supp. 339, 341 (S.D.N.Y. 1985) (noting that "[t]he general

principle is that a corporate officer who participates in a tort, even if it is in the course of his

duties, may be held individually responsible"); *Key Bank of New York v. Grossi*, 227 A.D.2d

841, 843, 642 N.Y.S.2d 403, 404 (3d Dept. 1996) (corporate officers may be personally liable for

commissions of torts "even if the commission or participation is for the corporation's benefit").

For the foregoing reasons, I hold that New Liberty and Roni Rubinov are liable to VNB,

jointly and severally, in the amount of $1,242,722.07 with respect to VNB's conversion claims.

VNB has also asserted a "negligence" claim, but I see no basis for a separate

"negligence" cause of action.  VNB has asked me to impose a constructive trust, but that relief is

not appropriate here because there has been no showing that New Liberty or Roni Rubinov actually still have possession of the pawned items or that they actually hold "proceeds" that can be directly traced to those items. *In re Dreier LLP*, 683 Fed Appx 78, 80 (2d Cir. 2017) (summary order) (noting that a claim must trace its "own property into a product in the hands of the wrongdoer"); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir.2011) (noting that "[t]racing is necessary where a private plaintiff seeks to impose a constructive trust, because liability is premised on the fiction that the victim at all times retained title to the property in question, which the defendant merely holds in trust for him. Consequently, a plaintiff who has obtained a constructive trust is generally entitled to priority over other creditors in satisfying his judgment from the proceeds of the traceable funds or property"); *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985) (noting that "before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer."); *United States v Ovid*, 09-CR-216 (JG) (ALC), 2012 WL 2087084, at *5 (E.D.N.Y. June 8, 2012) (noting that "[a] claimant seeking a constructive trust must be able to trace its property into identifiable assets over which the trust is to be imposed.").

Finally, VNB has asserted claims against Avner Rubinov and New York Estate Buyers, but the evidence at trial did not support any of those claims. I find that Avner Rubinov and New York Estate Buyers did not purchase the pawned items, did not otherwise receive them, and did not otherwise engage in any conduct that would support liability under any of the claims alleged by VNB.

**B.    The Trustee's Claims.**

New Liberty violated AN Frieda's rights under New York law in a number of respects. New York Law did not permit the disposition of pawned items until the statutory redemption

39

periods had expired, and they had not expired in this case. New York law also required that any

sale of the pawned items be on commercially reasonable terms, and that did not occur.

Furthermore, New York law required that AN Frieda be paid the surplus value of the collateral.

As noted above, New Liberty invented fictitious transactions for the purpose of attempting to

defeat those rights.

However, the Trustee has not asserted any claim under New York law. The only claim

that the Trustee asserted and pursued at trial was a claim that New Liberty had made a post-

petition transfer of estate property in violation of section 549 of the Bankruptcy Code, and that

the Trustee should be allowed to recover the property (or its value) under section 550 of the

Bankruptcy Code.

Even if the Trustee had pursued a claim under New York law, it appears that the Trustee

would not have been able to prove damages. The evidence at trial showed that VNB had a prior

secured claim in the collateral, as explained above. In addition, New Liberty had a junior

secured claim. At earlier times during this proceeding the Trustee suggested that he intended to

challenge the validity of the underlying pawn transactions, but at trial the Trustee did not do so.

Any challenges to the validity of those transactions was dropped, and no evidence was offered

that would support a contention that they were invalid. New Liberty's own secured claims (in

the amounts of its loans plus accrued but unpaid interest) may have been junior to VNB's claim,

but they were still valid and enforceable claims.

The value of the pledged items in this case ($1,283,725.71) was far less than the

combined total of the amounts owed to VNB and New Liberty. If the value of the pledged

collateral had first been paid to VNB with respect to its security interests, then it is quite clear

that any remaining value would have been insufficient to cover the junior secured claims of New

Liberty.  In that regard it is difficult to see how the Trustee could have proved damages for violations of New York State law.  The Trustee may have foregone redemption rights, but it would have been pointless for the Trustee to pay the full "redemption" values to New Liberty in order to obtain a return of the collateral.  Doing so would only have given a windfall to New Liberty, leaving the Trustee with the obligation to satisfy the VNB secured claim and resulting in a huge net loss to the estate.  The Trustee had a right to any "surplus" proceeds, but after payment of both the VNB and New Liberty claims following a sale there would have been no "excess" value that would have been payable to the Trustee, because the secured creditors' claims would have consumed all of the value.

The Trustee has argued that New Liberty violated section 549 of the Bankruptcy Code.  I have found for the reasons stated above that New Liberty did not actually transfer the pledged items to New York Estate Buyers.  But something happened to the property, as it is not currently available to AN Frieda.  So even if New Liberty appropriated the items to its own use and enjoyment, to the exclusion of AN Frieda, the removal of the property from AN Frieda's reach can be regarded as a "transfer."

If a transfer has been avoided under section 549, then section 550 permits the Trustee to recover the transferred property "or its value" from the "transferee" or from "the entity for whose benefit" the transfer was made.  *See* 11 U.S.C. § 550.  I do not know who the "transferee" was, but there is sufficient evidence that whatever happened to the pledged items was "for the benefit" of New Liberty.

However, if I were to require New Liberty to turn over the value of the relevant items, the amounts paid to the Trustee would still be subject to VNB's first priority security interest and then to New Liberty's junior security interests.  I note in this regard that my own prior turnover

order made clear that if property was turned over to the Trustee it would remain subject to existing security interests, including the secured claims of the persons who had previously had possession. *See* PX3. The effect of a judgment for the Trustee under section 550, then, would be an elaborate round-tripping, in which (a) New Liberty would pay the value to the Trustee, (b) the recoveries would first be allocated to VNB's secured claim against the estate, and (c) the balance would then be applied against New Liberty's junior claim. In the end there would be no net benefit to the estate. VNB's claim would be extinguished, but that is the same thing that would happen if New Liberty were to make payments to VNB based on VNB's own claims. That makes no sense, and in similar situations a number of courts have refused to enter judgments under sections 549 and 550. *See Jubber v. Bank of Utah (In re C.W. Mining Co.)*, 749 F.3d 895, 898-99 (10th Cir. 2014) (refusing to invalidate a bank's post-petition liquidation of a certificate of deposit because the transaction reduced the bank's secured claim, the estate suffered no damage, and a reversal of the transfer would just have reinstated the secured claim as well, leaving no net value for the estate); *Schnittjer v. Burke Constr. Co. (In re Drahn)*, 405 B.R. 470, 476-77 (Bankr. N.D. Iowa) (refusing to allow recovery from secured creditor of that portion of sale price that it received upon transfer of a mobile home equal to its security interest); *Weiss v. People Savings Bank (In re Three Partners, Inc.)*, 199 B.R. 230, 237-238 (Bankr. D. Mass. 1995) (concluding that a trustee could not avoid payments debtor made to bank out of the proceeds of prepetition collateral because the bank had a first secured position on that collateral and any recovery would ultimately be paid to the bank and not benefit the estate).

The Trustee's response is that I should require New Liberty to turn over the full value of the relevant property to the Trustee and that I should simultaneously disallow New Liberty's junior secured claim against the property pursuant to section 502(d) of the Bankruptcy Code, on

the grounds that New Liberty has to date failed to turn over the property to the Trustee.  *See* 11

U.S.C. § 502(d).  In that instance the Trustee would pay VNB's secured claim and keep the rest

for the benefit of unsecured creditors.

It is true that section 502(d) often is applied on an interim basis to delay the allowance of

a claim where the creditor is subject to a potential avoidance action.  4 *See* COLLIER ON

BANKRUPTCY ¶ 502.05[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that

"[t]he trustee often includes a cause of action under section 502(d) side-by-side with the

substantive avoidance claims, and all causes of action are then determined concurrently," which

has the "effect of delaying recovery by the defendants on their claims until the actions are

resolved"); *see also*, *In re Vivaro Corp.*, 541 BR 144, 155 (Bankr. S.D.N.Y. 2015) (noting that a

claim may be disallowed temporarily simply upon the allegation of an avoidable transfer).

However, the formal disallowance of a claim under section 502(d) is proper only where a

judgment has been entered that confirms the claimant's obligation to deliver property to the

estate, and only after the claimant fails to do so.  *In re Atlantic Computer Sys.,* 173 B.R. 858,

862 (S.D.N.Y. 1994) (noting that there must be "some sort of determination of the claimant's

liability before its claims are disallowed, and in the event of an adverse determination, the

provision of some opportunity to turn over the property"); *In re Allegheny Intern., Inc.*, 136 BR

396, 401 (Bankr. W.D. Pa. 1991), *affd and remanded*, 145 BR 823 (W.D. Pa. 1992) (noting that

section 502(d) cannot be interpreted as a forfeiture provision, and noting that payment at issue

was not determined to be preferential until court issued its decision and, in any event, the creditor

stated it was prepared to return payment if that were the ruling); *In re Philadelphia Newspapers*,

LLC, 468 B.R. 712, 728 (Bankr. E.D. Pa. 2012) (granting trustee's request to have creditor's

claims temporarily disallowed until creditor paid amount awarded to trustee in preference

action); *In re W & T Enterprises, Inc.*, 84 BR 838, 840 (Bankr MD Fla 1988 (finding that where trustee was entitled to avoid, pursuant to section 549, a transfer from debtor's checking account to bank, section 502(d) precluded the bank from filing a claim against the estate until the bank turned over the proceeds of the check to the trustee).

Here, there were disputed issues that had to be resolved before New Liberty's obligations could be liquidated, including disputes as to which items belonged to the estate and the values of those items. It would not be proper to invoke section 502(d) to expunge New Liberty's security interests before it even had the chance to comply with a judgment.

More importantly, the property at issue in this particular proceeding is different from the "property" that normally is subject to an avoidance action. In the ordinary avoidance action, there is no contingency to the question of whether the transferred property belonged to the estate, and no conditions that must first be met in order for the property to be treated as property of the estate. Here, however, if New Liberty had simply held the diamonds and other property and had never transferred them, then under section 541(a)(8) of the Bankruptcy Code those items would not even have been considered property of the estate unless the Trustee first paid the redemption prices. I do not believe it is a sound interpretation of the relevant sections of the Bankruptcy Code to say that the pawned items were subject to a redemption obligation – and would not even have constituted property of the estate unless the Trustee paid what was owed to New Liberty – but that the "transfer" of such property somehow frees the Trustee from that redemption condition, and somehow allows the Trustee to bring the property (or its value) into the estate while at the same time dishonoring the obligations owed to the pawnbroker.

Sections 502(d), 541, 549 and 550 need to be read together and harmonized with each other. If transfers are to be undone and avoided pursuant to sections 549 and 550, then the effect

44

ought to be to restore the parties to the positions they would have occupied if the transfers had not occurred. Here, that would merely reinstate (not eliminate) the Trustee's redemption obligations and the protections to which New Liberty was entitled under section 541(a)(8).

I therefore hold that the Trustee's claims under section 549 and 550 do not permit the Trustee to ignore the amounts owed to New Liberty or the redemption conditions that are imposed by section 541(a)(8) of the Bankruptcy Code. I could in theory enter a judgment that would reinstate the Trustee's redemption rights and that would permit the Trustee to exercise those rights, but it plainly would make no sense to do so. As explained above, full payment of the redemption prices would pay off the junior secured claims of New Liberty, but the recovered property (or proceeds) would still be subject to the prior secured claims of VNB. In that event New Liberty would just receive a windfall, while the estate would be severely depleted. In any event, the Trustee has not asked me to restore redemption rights. The Trustee instead wants to recover the full value of the pawned items pursuant to section 549 and 550 of the Bankruptcy Code, without payment of the amounts owed to New Liberty. The Trustee is not entitled to that relief.

The Trustee also sued Roni Rubinov, Avner Rubinov and New York Estate Buyers as alleged transferees of AN Frieda's property. However, no evidence was offered showing that Roni Rubinov actually received the items that belonged to AN Frieda, or that would otherwise suffice to show that Roni Rubinov was a "subsequent transferee" of property of AN Frieda that was wrongly transferred by New Liberty. In addition, as explained above, the evidence did not sustain the contention that Avner Rubinov and/or New York Estate Buyers received any such property. The Trustee therefore is not entitled to judgment against any of those defendants.

45

## Conclusion

I hold that New Liberty wrongly diverted property that was subject to the prior perfected secured claim of VNB.  New Liberty's failure to check the UCC filings, and its disposition of the collateral in deliberate disregard of VNB's perfected rights, constituted a conversion of property under New York law.  VNB's claim has been assigned to the Trustee pursuant to the stipulation between those parties, and judgment on VNB's claim will be entered in favor of the Trustee, and against New Liberty and Roni Rubinov, in the amount of $1,242,722.07.  The default judgments against Avner Rubinov and New York Estate Buyers will be vacated, and judgment will be entered in favor of the defendants as to all other claims.

Dated:  New York, New York
       April 29, 2020

/s/ **Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge